637 F.2d 898
 Richard M. LECATES, individually and on behalf of all others
similarly situated, Appellant,
v.
JUSTICE OF the PEACE COURT NO. 4 OF the STATE OF DELAWARE;
Justice of the Peace Horace W. Short, individually, in his
official capacity, and as a representative of all Justices
of the Peace of the State of Delaware and Sussex Trust
Company, a corporation of the State of Delaware, real party
in interest.
 No. 80-1159.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 19, 1980.
Decided Dec. 30, 1980.
 
 Gary A. Myers (argued), Staff Atty., Community Legal Aid Society, Inc., Georgetown, Del., for appellant.
 Donald L. Bruton (argued), Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for appellees.
 Before ADAMS, HUNTER and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 The State of Delaware maintains a two-tier trial court system. It is comprised of courts of record, presided over by legally trained judges, and justice of the peace courts, staffed by magistrates with no legal training. An unsuccessful party in a justice of the peace court is entitled to a trial de novo in Superior Court, but a losing defendant must first post a surety bond in order to obtain such a trial. In this appeal an indigent defendant in a civil suit contends that the nonwaivable bond requirement operates to deny indigents due process of law as well as equal protection of the laws, because the poor are unable to obtain the full extent of judicial process and constitutional protections afforded more affluent litigants. The district court rejected these contentions and entered judgment for defendants. We reverse, because we conclude that Delaware's failure to permit an indigent defendant to proceed without posting a bond denies such a person due process of law.
 
 I.
 
 2
 Appellant Richard Lecates borrowed $2,400 from Sussex Trust Company, executing a promissory note for repayment in monthly installments, with his Chevrolet automobile serving as collateral. Lecates subsequently was laid-off from his job, and as a result defaulted on the monthly payments. Sussex Trust repossessed the Chevrolet and sold it for $900 under an installment sales contract. The repossession of the vehicle and its resale allegedly were consummated in violation of the Uniform Commercial Code (the UCC), in that the bank failed to notify Lecates of either the intended disposition of the collateral or the actual sale. Del.Code tit. 6, § 9-504(3). After the first purchaser failed to meet installments, Sussex Trust again repossessed and sold the car to an automobile dealer for its salvage value of $300. The second sale was also conducted without notice to Lecates.
 
 
 3
 Sussex Trust wrote to Lecates demanding payment of the deficiency of $1,860, and then instituted a civil debt action in Justice of the Peace Court No. 4 in Seaford, Delaware, seeking a judgment for $1,500.[1]
 
 
 4
 In Delaware, justice of the peace (JP) courts, the lowest level of the judicial system, are not courts of record; proceedings are neither recorded nor accompanied by published precedential opinions. Justice of the peace courts have concurrent jurisdiction with the Superior Court and the Court of Common Pleas over debt actions involving $1,500 or less. Del.Code tit. 10, § 9301. There are significant differences in the procedural protections available to defendants in the various tribunals, however.
 
 
 5
 The JP court is a far more informal tribunal for adjudicating disputes than the courts of record, and consequently, it is often more expeditious and less expensive. Actions are commenced by filing a praecipe, which is followed by a summons served on the defendant. Del.Code tit. 10, §§ 9521-22. In the courts of record, a plaintiff must also file a complaint identifying the basis of the claim for relief, which the defendant is entitled to answer. A JP defendant may request a bill of particulars detailing the facts supporting the claim, but this is the sole discovery device permitted in the JP courts.[2] A full panoply of discovery procedures, including interrogatories, depositions, and requests for production of documents, is available to the parties in Superior Court and the Court of Common Pleas. There is no provision for a jury trial before a justice of the peace, J.P.Civ.R. 14, whereas in Superior Court a jury trial may be obtained upon a timely demand. Del.Code tit. 10, § 563. If a defendant in the Court of Common Pleas desires a jury, he or she simply removes the case to Superior Court, paying a small filing fee. Del.Code tit. 10, § 1320(b), (d). This filing fee is waivable for indigents. Super.Ct. Rule 112; CCP Rule 110.
 
 
 6
 Judgments entered by justice of the peace courts may be appealed to the Superior Court for a trial de novo. Del.Code tit. 10, §§ 9570, 9573, and the institution of an action in Superior Court renders the JP proceedings a nullity. If the appellant was the defendant before the justice of the peace, however, he or she must post a bond executed by a surety, which makes the surety equally liable on any judgment rendered in Superior Court. A bond may also be posted by an individual other than the appellant who owns a sufficient amount of real property. Del.Code tit. 10, §§ 9571-72. At a minimum, the value of the bond must be equal to the amount of the judgment plus costs, but it may be higher at the discretion of the magistrate. A defendant cannot satisfy the requirement by posting cash or property, because the appeal bond statute seeks to accomplish more than to protect the judgment below it is also designed to assure that any judgment entered against the appellant in excess of the bond amount will be satisfied. Trala v. Melmar Indus., Inc., 254 A.2d 249 (Del.Super.Ct.1969). The bond requirement cannot be waived by a magistrate. State ex rel. Caulk v. Nichols, 281 A.2d 24 (Del.1972). A losing plaintiff in JP court is not required to post a surety bond in order to appeal; he or she must pay only the Superior Court costs. Del.Code tit. 10, § 9571.
 
 
 7
 Appellate review of judgments entered in the Court of Common Pleas lies in the Superior Court, and is on the record rather than de novo. Del.Code tit. 10, § 1318. Superior Court decisions may be appealed to the Delaware Supreme Court. Del.Const. art. IV, § 11(1)(a).
 
 
 8
 Another major difference between the two tiers of the Delaware trial court system is the nature of the judges that preside over each tribunal. Justices of the Peace, appointed for four year terms, need not be lawyers admitted to the bar or persons trained in the law. Indeed, at least until 1976, the year of Lecates' trial, no justice of the peace had been a lawyer. Judges of the Superior Court and Court of Common Pleas, on the other hand, are required by the state constitution to have a formal legal education and to be members of the state bar. Del.Const. art. IV, § 2.
 
 
 9
 The action by Sussex Trust against Lecates was tried before Justice of the Peace Short in August, 1976. Justice Short was a new appointee, whose formal education ended at high school. Prior to his appointment he had been a state trooper, a town alderman, and a shipping clerk. Devoid of legal training, he had no knowledge of the tools of legal research or the role of precedent. On a few occasions, he had visited a law library, but simply to "browse through." His method of conducting legal research was to pose hypothetical questions to another JP or to a Common Pleas judge.
 
 
 10
 At the proceeding before Justice Short, Lecates requested a jury trial. After this request was refused, Lecates' attorney moved to dismiss the claim asserted by Sussex Trust on the ground that the bank's violations of the Uniform Commercial Code barred it from recovering a deficiency.[3] Justice Short, by his own admission utterly unfamiliar with the U.C.C. or the precepts of secured transactions, denied the motion and refused to entertain briefs on the legal question. Instead, he proceeded to enter judgment in favor of Sussex Trust. Denying the request that Lecates' bond be waived because of his indigency, on the ground that he had no power to do so, Justice Short set the bond at $1,500.
 
 
 11
 Lecates' indigency is well-established. From May through October of 1976, Lecates' only income was $25-30 per week. His family relied on food stamps and the Salvation Army for the basic necessities of life. Lecates had no collateral to post for a bond, because he was already delinquent on house and car payments, and he had to sell many items of furniture to meet utility and other bills. By reason of his indigency[4] Lecates was unsuccessful in his efforts to secure a surety bond. Of the ten agencies approached, some declined to act as surety because they did not issue bonds for JP appeals, and others refused because Lecates lacked funds or any other assets to guarantee payment. Consequently, Lecates was unable to obtain a trial by jury presided over by a lawyer-judge in the Superior Court.
 
 
 12
 Lecates then filed this action for injunctive and declaratory relief under 42 U.S.C. § 1983, asserting that the surety bond requirement deprived him, a pauper, of due process by foreclosing access to the regular court system. He also contended that the bond requirement violated his right to equal protection because similarly situated indigent defendants in the courts of record automatically received the full extent of procedural protections.
 
 
 13
 The district court dismissed Lecates' claims, concluding that it was bound by the Supreme Court's summary disposition in 1972 of State ex rel. Caulk v. Nichols,[5] a case in which the Delaware Supreme Court rejected an equal protection challenge to the identical Delaware statute. Determining, however, that the United States Supreme Court in Caulk had not considered one of the precise equal protection issues framed by Lecates, the district court proceeded to evaluate Lecates' claim that his treatment was dissimilar to that accorded indigent civil defendants sued in the courts of record. After a one-day non-jury trial, the district court found no denial of equal protection, ascertaining that Delaware had a rational basis for the surety bond requirement. This appeal followed.
 
 II.
 
 14
 It is necessary to determine at the outset of our analysis whether we are precluded from examining the merits of Lecates' contentions by virtue of the doctrine of Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). In Hicks the Supreme Court admonished that, absent supervening doctrinal developments, a summary affirmance or dismissal for want of a substantial federal question must be regarded as a disposition on the merits. The rationale for treating them as such is that the Supreme Court's jurisdiction over appeals from state courts is obligatory, and the Court therefore has no discretion to decline adjudicating the merits. Id. at 344, 95 S.Ct. at 2289. Justice White, writing for the Court, indicated, however, that lower courts would be bound only to the extent that the issues in the previous case were sufficiently the same to warrant treating it as a controlling precedent. He recognized further that ascertaining the content of summary dispositions would be no easy task.
 
 
 15
 From its inception, the rule of construction announced in Hicks v. Miranda appeared somewhat vulnerable, as criticism both from within the Court and from scholarly commentators[6] was forcefully expressed. Justice Brennan argued that summary dispositions should not be accorded conclusive weight, because in practice such dispositions frequently received little more reasoned consideration than certiorari denials.[7] He, along with Chief Justice Burger, suggested that summary dispositions should be treated as affirmances only of the judgment, and not the reasoning of the lower court.[8] As the Supreme Court grappled with applying Hicks and ascertaining the implicit reach of summary dispositions, it began to qualify, by way of explaining, its strict edict that summary dispositions are completely conclusive of similar cases.[9] In Mandel v. Bradley, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), the full Court finally embraced the position that had been advanced by Chief Justice Burger and Justice Brennan, and held that summary affirmances approve the result, but not necessarily the reasoning, of the decision under appeal. The Court instructed lower courts (1) to scrutinize the particular facts and the jurisdictional statement of a case that was summarily disposed of to determine the "precise issues presented and necessarily decided" by the summary action, and (2) to give conclusive effect only to these narrow questions. Id. at 176, 97 S.Ct. at 2240.[10]
 
 
 16
 Doubts remained, however, whether issues "necessarily decided" included arguments that could be inferred from a petitioner's more explicit contentions. These doubts were resolved in Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), in which the Court expanded Mandel, and made it clear that lower courts have leeway to consider the merits of cases within the confines of the Hicks doctrine. Specifically, Justice Marshall held that lower courts are foreclosed from re-examining only the exact question formally made part of the jurisdictional statement in a case receiving summary treatment; no opinion on the merits of issues that "merely lurk in the record" may be inferred from a summary disposition. Id. at 182-83.
 
 
 17
 Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), which the dissent relies on to argue that Illinois State Board of Elections did not qualify the Hicks doctrine, was actually decided prior to Illinois State Board. The discussion of Hicks in Yakima Indian Nation, was relegated to a footnote and was subsidiary to the central issues in the case, whereas in Illinois State Board the Court focused far more attention on the treatment to be accorded summary dispositions. Consequently, the more recent and more considered discussion of the Hicks doctrine in Illinois State Board would appear to be a sounder indication of the Supreme Court's thinking on the question of the precedential effect of summary dispositions. Moreover, when the discussion in Yakima Indian Nation is read in full, it is apparent that, similar to Mandel and Illinois State Board, it also limits the broad implications of the statements in Hicks :
 
 
 18
 Our summary dismissals are, of course, to be taken as rulings on the merits, Hicks v. Miranda, 422 U.S. 332, 343-345 (93 S.Ct. 2281, 2288-2289, 45 L.Ed.2d 223) in the sense that they rejected the "specific challenges presented in the statement of jurisdiction" and left "undisturbed the judgment appealed from." Mandel v. Bradley, 432 U.S. 173, 176 (97 S.Ct. 2238, 2240, 53 L.Ed.2d 199). They do not, however, have the same precedential value here as does an opinion of this Court after briefing and oral argument on the merits, Edelman v. Jordan, 415 U.S. 651, 670-671 (94 S.Ct. 1347, 1359, 39 L.Ed.2d 662); Richardson v. Ramirez, 418 U.S. 24, 53 (94 S.Ct. 2655, 2670, 41 L.Ed.2d 551). A summary dismissal of an appeal represents no more than a view that the judgment appealed from was correct as to those federal questions raised and necessary to the decision. It does not, as we have continued to stress, see, e. g., Mandel v. Bradley, supra, necessarily reflect our agreement with the opinion of the court whose judgment is appealed. It is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action.
 
 
 19
 439 U.S. at 477, n.20, 99 S.Ct. at 749.
 
 
 20
 We recount this history of the eventual evolution away from a strict application of the Hicks v. Miranda rule to demonstrate that lower courts are not absolutely precluded from considering the merits of contentions that are similar to issues raised in a summarily affirmed case. In short, under Mandel and Illinois State Board, the precedential value of a summary disposition by the Supreme Court is to be confined to the exact facts of the case and to the precise question posed in the jurisdictional statement. Furthermore, indications that there have been doctrinal developments since the summary action will relieve a lower court from the duty to adhere to a summary disposition.
 
 
 21
 This is not to suggest that summary dispositions may be disregarded or should have little weight. On the contrary, in those situations where a summary disposition is applicable, it is a binding precedent. The recent Supreme Court explanations indicate, however, that we must ascertain carefully whether a summary affirmance or dismissal does indeed apply in a subsequent case. And it is precisely this exercise which engages us in the present situation.
 
 
 22
 The dissent argues that only the Supreme Court may pursue the sort of examination we undertake here. Typescript at p. 31. As the previous discussion of these cases indicates, however, in Mandel and Illinois State Board it was clear that the Supreme Court was establishing guidelines by which lower courts may evaluate the precedential reach of summary dispositions. See, e. g., 432 U.S. at 179-80, 97 S.Ct. at 2242 (Brennan, J. concurring). For example, in Mandel the Court reversed the lower court for rigidly relying on a previous summary affirmance without the sort of examination pursued here: "Because of its preoccupation with Salera, the District Court failed to undertake an independent examination of the merits." Id. at 177, 97 S.Ct. at 2241. The Supreme Court went on to explain the treatment lower courts should accord summary dispositions. In Illinois State Board the Supreme Court agreed with the conclusion of a lower court that a prior summary affirmance was not binding. The Supreme Court echoed the conclusion of the lower court that the equal protection issue in the current dispute was framed differently from the precise question posed and necessarily decided in the earlier case. 440 U.S. at 181, 99 S.Ct. at 989. This treatment of the lower court's action indicates that the Court approved of the manner in which it re-examined the summary affirmance.
 
 
 23
 Applying these precepts here, we must first examine the facts and jurisdictional statement in Caulk v. Nichols and compare them with the facts and precise issues presented by Lecates' suit. By doing this we are not reconsidering Caulk itself or suggesting that it has been or should be overruled. Rather, we are only seeking to ascertain whether Lecates presents a different case from Caulk, so that Caulk is not a controlling precedent foreclosing an examination of the merits here.
 
 
 24
 Several factual distinctions between the two cases are readily apparent. Caulk was a landlord-tenant action for back rent, and when the justice of the peace entered a judgment for $300 against the tenant, the Caulks did not attempt to secure a bond, as Lecates did. Thus, there was no factual finding, as there is here, that the Caulks were unable to obtain a bond because of their indigency. Instead of seeking a bond, the Caulks brought a mandamus action to compel the justice of the peace to waive the bond requirement. Consequently, the primary issue before the Delaware Supreme Court was whether the statute authorized a magistrate to forego a bond. The Caulks also made this issue the focus of their appeal to the United States Supreme Court, where they contended that unless the bond statute was construed to permit waiver, it would violate equal protection. The equal protection arguments advanced by the Caulks in their jurisdictional statement and disposed of by the Delaware Supreme Court were (1) that the bond requirement discriminated against defendants in JP courts vis-a-vis JP plaintiffs; (2) that it discriminated against JP defendants when compared with Superior Court defendants; and (3) that it discriminated on the basis of the suspect criterion of wealth. The sole due process contention in the jurisdictional statement was that the bond requirement deprived the Caulks of their right to appeal. This allegation, briefly mentioned at the end of the jurisdictional statement, almost as an afterthought, was hardly the focus of the case. To the extent that the Caulks complained, in one brief phrase, of a lack of a jury trial, they seemed to claim in the abstract that some provision in the federal constitution guaranteed all state litigants a right to trial by jury.
 
 
 25
 The Caulks' jurisdictional statement cannot fairly be read as raising the far narrower due process claim asserted by Lecates; namely, that so long as the state constitution guarantees him a trial de novo with a jury, then that is the manner of hearing appropriate to the nature of his interest, within the meaning of the due process clause. The jurisdictional statement in Caulk nowhere mentions the appropriateness of the proceedings to the interest at stake, as defined by the state constitution. Moreover, in Illinois State Board the Supreme Court indicated that issues only briefly alluded to in a jurisdictional statement cannot be deemed to have been precisely presented and necessarily decided by a summary disposition. 440 U.S. at 182, 99 S.Ct. at 989.
 
 
 26
 This review of the Caulk jurisdictional statement reveals that the earlier case, which centered on the now rejected equal protection theory of indigents as a suspect class, posed questions of a different nature from those raised by Lecates. Many of the arguments marshalled in Caulk attacked the constitutionality of the appeal bond statute under all circumstances, rather than as it affected indigents. Lecates, however, does not seek to strike down the appeal bond statute. He takes umbrage only at the way in which the nonwaivable bond affects him, as an indigent defendant. The thrust of Lecates' challenge to the bond requirement is that it violates his due process right to be heard in a manner appropriate to the nature of his interest. Lecates does not contend, as the Caulks did, that he has a due process right to an appeal; instead, he directs our attention to the nature of the trial process guaranteed by the state itself and the extent of his access to that state-controlled process.[11] This is a claim that is distinct from the Caulks' allusion to access to courts generally.
 
 
 27
 Specifically, Lecates objects to the way in which the bond statute operates to deny him, as an indigent, the right to a jury trial that is guaranteed by the Delaware Constitution. He further contends that due process is violated because he is foreclosed from the opportunity to have his legal defenses evaluated by a judge who is trained in and knowledgeable of the law just as all other citizens of Delaware who are able to post a bond have such an opportunity. Neither the question of the right to a jury trial nor the right to a lawyer-judge was discussed in Caulk, so it cannot be said that these concerns even "lurked in the record" of that case. Thus, under the standard announced in Illinois State Board of Elections, the summary affirmance in Caulk is not dispositive of Lecates' due process claims.
 
 
 28
 A further reason why Caulk does not prevent us from examining the merits of these claims is that there appears to have been a subsequent doctrinal development to temper the effect of the Supreme Court ruling in that case. In the term after Caulk was decided, the Court noted probable jurisdiction in a case challenging a West Virginia statute that required a surety bond in order to appeal from a justice of the peace court. Patterson v. Warner, 371 F.Supp. 1362 (S.D.W.Va.1972), prob. jurisd. noted, 411 U.S. 905, 93 S.Ct. 1533, 36 L.Ed.2d 194 (1973).[12] Scrutiny of the jurisdictional statement in Patterson reveals that its facts and several of the questions presented make it closer than Caulk to the occurrent situation. Patterson was a § 1983 action arising out of a JP proceeding to collect a debt, where the defendant also unsuccessfully attempted before the JP to interpose defenses based on the U.C.C. The claims in Patterson focused on the due process clause, and, as in the present case, the indigent plaintiff complained that the bond requirement transgressed an indigent's right to a trial appropriate to the nature of the interest at stake. Specifically, Patterson, similar to Lecates, sought to protect his right to a jury trial guaranteed by the state constitution. Although the West Virginia statute under attack imposed a requirement that the bond be double the amount of the judgment, this fact would not appear to render Patterson inapposite to the case at hand. The main portion of the jurisdictional statement challenged the operation of the bond requirement, regardless of amount. Indeed, the question presented was virtually identical to the issue stated by Lecates: whether "a statutory cost requirement that denies a plenary hearing of right is a denial of access to the courts as guaranteed by the due process clause."[13] The second half of the document discussed the double aspects of the bond, asserting that this feature violated the equal protection clause.
 
 
 29
 The due process questions framed in Patterson, however, did not deal with the double amount of the bond, and it is due process that forms the basis of Lecates' claim. Following the admonition of Illinois State Board that the lower federal courts must consider every question specifically framed in a jurisdictional statement, we cannot say, therefore, that the Supreme Court was motivated solely by the double amount aspects of the West Virginia statute when it accepted Patterson for review. Thus, the notation of jurisdiction in Patterson may be regarded as a doctrinal development freeing lower courts from the strictures of the Hicks v. Miranda rule in this situation.[14]
 
 
 30
 Under these circumstances, then, this Court may, and indeed has an obligation to, evaluate the merits of Lecates' challenge. To avoid our duty to decide a case properly before us by an unquestioning reliance on Caulk, where critical differences appear between the two cases, would retard the development of constitutional principles, a process that finds its vitality in searching inquiry and the willingness to bring new insights to bear on recurring problems.[15] Moreover, such a practice might place an undue burden on the Supreme Court since it would have to consider appeals from similar cases without the advantage of a court of appeals opinion on the merits.
 
 III.
 
 31
 Lecates' challenge to the Delaware surety bond statute draws on principles of both procedural and substantive due process. His claim presents elements of procedural due process insofar as he asserts that the bond requirement operates to deny indigent defendants the opportunity to be heard in a manner appropriate to the nature of their interest at stake in a particular civil suit. Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Underlying this procedural assertion is the substantive premise that the due process clause guarantees indigent defendants in civil suits the same extent of access to the "appropriate" procedures and protections of the state-controlled legal machinery as is available to more affluent litigants. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).
 
 
 32
 Boddie directly supports the proposition that an indigent civil defendant such as Lecates has a right of equal recourse to the complete range of the trial machinery by which the state declares legal rights and imposes legal obligations. Although the Supreme Court in Boddie was concerned with etablishing a right of initial access for a plaintiff, Justice Harlan supported the Court's holding that a state cannot erect financial barriers to access to state-controlled divorce proceedings by analogizing the position of a person seeking a divorce to that of a civil defendant.[16] Both are at the mercy of the government, which holds exclusive dominion over the means to secure or protect the respective legal rights and interests. Both the person desiring a divorce and a defendant involuntarily haled into court have no realistic alternative but to pursue the judicial processes established by the sovereign. As Justice Harlan observed, the "successful invocation of this governmental power (the court system) by plaintiffs has often created serious problems for defendants' rights. For at that point, the judicial proceeding becomes the only effective means of resolving the dispute at hand and denial of a defendant's full access to that process raises grave problems for its legitimacy." 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113. This wisdom would seem to be applicable to Lecates' plight. When Sussex Trust Company resorted to the state judicial process to seek collection of a debt allegedly owed it, Lecates had no alternative but to endure this process and present his defense within its confines. Once an indigent defendant such as Lecates is brought within the ambit of the state's judicial power, his right to receive the same protections and procedures required by state law to be extended to all other litigants may not be conditioned upon his financial means.
 
 
 33
 Delaware, in defending its surety bond requirement, suggests that the due process holding in Boddie rested solely on the fundamental nature of the marriage relationship involved in that controversy. In the cases examining a plaintiff's right of court access subsequent to Boddie, the Court has upheld financial barriers because the plaintiffs had no fundamental rights at stake. United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) (filing fee to obtain discharge in bankruptcy does not impinge on indigent's due process rights); Ortwein v. Schwab, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (filing fee to obtain judicial review of administrative reduction in welfare benefits does not violate due process). While these cases emphasize that due process does not guarantee unlimited initial court access for plaintiffs in all circumstances, they also reveal that Boddie did not turn exclusively on the nature of the interest the plaintiff sought to vindicate. In Kras and Ortwein the Court alluded to the availability to plaintiffs of relief outside the judicial system. It thus appears that the Court was concerned with the theoretical voluntariness of the plaintiffs' entry into court. This concern does not apply to Lecates, who is a defendant, brought into court against his will. Once in court, he has no choice but to defend himself against the claim asserted as best he can.[17] When viewed from this perspective, Kras and Ortwein do not disparage the teaching of Boddie that the due process clause guarantees equal access to judicial processes for defendants when (1) resort to the courts is the sole path of relief, and (2) governmental control over the process for defining rights and obligations is exclusive. The reasoning displayed in Justice Harlan's extensive discussion in Boddie of the rights of defendants therefore remains viable because, as he recognized, the judicial system is the exclusive peaceful means by which a defendant may protect his rights and interests.[18]
 
 
 34
 Thus, the central wisdom of Boddie informs our resolution of the present case: "Due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." 401 U.S. at 377, 91 S.Ct. 785.
 
 
 35
 In this instance, th Delaware Constitution defines the manner of hearing that establishes a "meaningful opportunity to be heard."[19] In Delaware, the right of trial by jury is deemed to be a fundamental liberty. The Declaration of Rights and Fundamental Rules of Delaware § 13 (1776) proclaims "That trial by jury of facts where they arise is one of the greatest securities of the lives, liberties and estates of the people." This principle is embodied in Art I, § 4 of the State Constitution, which provides for a right to a jury trial in civil cases as it existed at common law. Fountain v. State, 275 A.2d 251 (Del.1971). Actions sounding in debt, such as the present case, are encompassed within this constitutional guarantee. In Re Markel, 254 A.2d 236 (Del.1969); Getty Refining & Mfg. Co. v. Park Oil, Inc., 385 A.2d 147 (Del.Ch.1978).
 
 
 36
 Exhibiting great sensitivity to the need to preserve the guarantee of a jury trial, the highest court in Delaware announced over a century ago that the right to receive a trial de novo in Superior Court of a matter decided by a justice of the peace is a constitutional requirement, flowing from the jury trial provision in Art. I, § 4. Waples v. Gum, 5 Harr. 404 (Del. Error & Appeals 1853).[20] Similarly, in Wilson v. Oldfield, 1 Del.Cas. 622 (Ct.Comm. Pleas 1818), the court held that the justice of the peace system comported with the State Constitution because JP proceedings were merely preliminary to trials in Superior Court. In the court's view the JP system did not contravene the jury trial guarantee only so long as the parties had free and untrammelled recourse to the Superior Court.
 
 
 37
 Having granted civil defendants such as Lecates a constitutional right to a jury trial, Delaware may not, consonant with due process, make a defendant's opportunity to enjoy the right dependent on the amount of money he has. If Delaware is to conform to the mandate of due process, it cannot deny to some litigants, in cases derived from common law actions, on the sole ground of wealth, the right to trial by jury which the state's own Constitution erects as an essential component of a "meaningful opportunity to be heard" for all such civil litigants. Lecates' due process right to a jury trial the type of proceeding the state deems appropriate to the nature of his interest is abridged when, through the conjunction of the plaintiff's choice of forum, the surety bond requirement, and the defendant's indigency, he does not have the same recourse to Superior Court as more affluent litigants.
 
 
 38
 Delaware's Constitution also ordains that all courts shall be open to all litigants on an equal basis, and that all judicial matters shall be resolved in accordance with "the very right of the cause and the law of the land." Art. I, § 9. If this due process right to have the law properly applied to one's legal claims is to have meaningful content, it would seem that a litigant should be afforded, at some point in the judicial process, a judge who is knowledgeable about the law. Cf. North v. Russell, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976), in which the United States Supreme Court held that Kentucky's two-tier court system, with nonlawyer judges at the justice of the peace level, did not violate due process because the state provided an automatic trial de novo before a learned judge.[21]
 
 
 39
 The dangers inherent in entrusting an untrained lay judge with the power to declare with finality legal rights, duties, or burdens have often been delineated. A judge devoid of training in the complexities of the law, the subtleties of legal reasoning, or the methodology of legal research may tend to decide each matter according to personal predilection or assumption.[22] The command of statutes and the teachings of precedents may well be ignored in such a process. Moreover, such errors may go uncorrected unless de novo review is available, since lay judges do not sit on courts of record.[23]
 
 
 40
 Recent empirical studies have borne out these observations. A statistical comparison of the performance and attitudes of lay and lawyer judges in New York State revealed that lay judges relied far more on assertions by governmental authorities than on investigations of the controlling legal principles.[24] This study also disclosed that lay judges demonstrated a measurable bias against indigents and policies or legal rules designed to aid the poor.[25] The conclusion of the authors was that nonlawyer judges "tend to tilt the delicate standard of due process away from individual defendants."
 
 
 41
 Access to a legally-trained judge at some stage of the adjudicatory process would appear to be an especially compelling safeguard in our complex contemporary legal system. The precepts of the common law often were derived from community notions of right and wrong, whereas today numerous statutes have established rules of conduct that depart from traditional standards. The breadth of subject matter and the technicalities of many modern statutes increase the potential that nonlawyer judges may not be able to resolve every matter "according to the very right of the cause and law of the land," as required by the Delaware Constitution. The present case illustrates the enhanced possibility of error by a lay judge. Justice of the Peace Short had no knowledge of the complicated substantive rules embodied in Article 9 of the Uniform Commercial Code, nor did he have the training to research and acquaint himself with these provisions. Thus, it is hardly surprising that he refused to entertain a defense based on the U.C.C., and apparently resolved the case exclusively on the theory that since Lecates had borrowed the money he must repay it.
 
 
 42
 The preceding discussion demonstrates that in Delaware, by virtue of the state constitution and general due process principles, a civil defendant's due process right to a "meaningful opportunity to be heard" entails the right to a jury trial and to a legally-trained judge at some point during the process of adjudication. Thus, Delaware cannot erect an absolute requirement, such as a surety bond, that serves to deny a defendant access to these constitutional protections solely because he is indigent. This is not to suggest that the surety bond requirement is per se unconstitutional. We hold only that insofar as it is not waivable for those truly unable to pay, it denies indigents due process of law.
 
 
 43
 We note that the Supreme Court has indicated that a state may have legitimate interests in maintaining the inexpensive and efficient justice of the peace system and the requirement of an appeal bond. As the Court recognized in Lindsey v. Normet, 405 U.S. 56, 76, 92 S.Ct. 862, 875, 31 L.Ed.2d 36 (1972), "a state may properly take steps to insure than an appellant post adequate security before an appeal to preserve the property at issue (or) to guard a damage award already made." Delaware, however, has offered no reason why plaintiffs who choose to pursue their claims in JP courts should receive greater protection than plaintiffs in the Delaware courts of record. There is no requirement of posting a surety bond, for example, before appealing a Superior Court judgment. Delaware also has an interest in discouraging frivolous appeals, but the state has not suggested that appeals from JP courts are inherently more frivolous than appeals from other tribunals. In Lindsey v. Normet, the Supreme Court rejected the contention that appeal bonds may be justified by a desire to screen out meritless appeals. 405 U.S. at 78, 92 S.Ct. at 876.
 
 
 44
 There is no evidence that the justice of the peace system would be threatened by the adoption of an in forma pauperis procedure to permit waiver of a bond for those who can prove their destitute condition. Other states with a justice of the peace system, for example, have adopted procedures to enable indigents to waive the appeal bond. See, e. g., Hampton v. Chatwin, 505 P.2d 1037, 109 Ariz. 98 (1973); Roberts v. Superior Court of Stanislaus County, 264 Cal.App.2d 235, 70 Cal.Rptr. 226 (1968). In addition, Delaware has permitted indigents to waive the fees necessary to remove a case from the Court of Common Pleas to Superior Court, Super.Ct. Rule 112; CCP Rule 110. Waiver has not affected the viability of either court system, while it has allowed accommodation for the right of an indigent to a jury trial.
 
 
 45
 Once it institutes a procedure by which indigent JP defendants may forego the appeal bond in order to gain access to the Superior Court review, Delaware might be able to resort to alternative means to protect the interests guarded by the surety statute. For example, to the extent the state wishes to protect a plaintiff's judgment, it can separate the right of appeal from the bond requirement by imposing a bond only when the defendant desires a stay of execution pending appeal. This is the same procedure now employed for appealing judgments of the Superior Court. To the extent that Delaware seeks to shield plaintiffs from the time and expense involved in enduring a second-full scale trial, the state could permit defendants sued in the JP court to remove a case to Superior Court prior to trial. This is the procedure currently available to reconcile the right to a jury trial for defendants sued in the Court of Common Pleas with a plaintiff's interest in trying his claim a single time only. Del. Code tit. 10, § 1320.
 
 
 46
 In the situation at issue, where the constitutional interests of an indigent sued before a justice of the peace is so fundamental, the state must make some accommodation to insure that indigents have an equal opportunity to receive the same judicial process that is within the reach of more fortunate litigants.[26]
 
 IV.
 
 47
 The judgment of the district court dismissing Lecates' claims on the merits will be reversed, and the case will be remanded to the district court so that the court may order relief consistent with this opinion.
 
 
 48
 JAMES HUNTER, III, Circuit Judge, dissenting.
 
 
 49
 Appellant contends that the Delaware statutes,[1] requiring an unsuccessful litigant to post an appeal bond prior to receiving de novo review in the Superior Court, operate to deny indigents due process of law. He also argues that the bond requirement violates equal protection of the laws because it: 1) deprives indigents of their right to appeal and 2) affords justice of the peace court defendants fewer procedural safeguards than available to defendants in courts of record. Because I believe that the Supreme Court's decision in State ex rel. Caulk v. Nichols, 408 U.S. 901, 92 S.Ct. 2501, 33 L.Ed.2d 327 (1972), dismissing appeal from 281 A.2d 24 (Del.1971), bars appellant's due process and first equal protection challenge, and that his remaining equal protection claim is without merit, I respectfully dissent.
 
 I.
 
 50
 Caulk involved a constitutional challenge to the identical Delaware statute. The Delaware Supreme Court rejected Caulk's claim that the statute, which requires an unsuccessful defendant to post a bond prior to appealing an adverse determination by the Justice of the Peace, violated the Equal Protection Clause of the Constitution. Moreover the Delaware court also explicitly rejected Caulk's due process challenge as well:
 
 
 51
 Appellants next contend that, by the bond requirement, they are denied due process of law because they are deprived of the fundamental right to litigate ... We find no ground for holding that they have been deprived of a right to trial.
 
 
 52
 281 A.2d at 27.
 
 
 53
 Caulk appealed the decision of Delaware's highest court to the United States Supreme Court. That court dismissed the appeal for want of a substantial federal question. The dismissal was a decision on the merits, and is binding upon lower courts.[2]
 
 
 54
 The Supreme Court explained the precedential effect of dismissals for want of a substantial federal question and summary affirmances[3] in Hicks v. Miranda, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). As the majority observes, Hicks counseled lower courts to treat summary affirmances and dismissals for want of a substantial federal question as decisions on the merits which were binding upon them "until such time as the Court informs (them) that they are not." Id. at 345, 95 S.Ct. at 2289. This court recognized soon after Hicks that there was no longer any doubt that dismissals of appeals by the Supreme Court for want of a substantial federal question were decisions on the merits that were to be accorded binding precedential effect. Colorado Springs Amusements, Ltd. v. Rizzo, 524 F.2d 571 (3d Cir. 1975), cert. denied, 428 U.S. 913, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976). See also Government of the Virgin Islands v. 19.623 Acres of Land, 536 F.2d 566 (3d Cir. 1976).
 
 
 55
 The majority contends that supervening case law has substantially eroded the Hicks rule. I disagree. The cases discussed by the majority represent an exposition rather than a rejection of the Hicks doctrine.
 
 
 56
 In Mandel v. Bradley, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), the Supreme Court explained the scope and effect of summary affirmances and dismissals for want of a substantial federal question.[4] Noting that such action is an affirmance of the judgment and not the rationale of the lower court, the Court stated that summary affirmances and dismissals for want of a substantial federal question "reject the specific challenges presented in the statement of jurisdiction." Id. at 176, 97 S.Ct. at 2240. The Court then cautioned lower courts on the binding nature of summary dispositions: "(t)hey do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." Id. (emphasis added).[5]
 
 
 57
 The Supreme Court's recent decision in Illinois State Board of Elections v. Socialist Workers Party, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), also represents an explanation rather than a rejection of Hicks. That case merely rehearsed the teaching of Mandel summary affirmances and dismissals for want of a substantial federal question reach "the precise issues presented and necessarily decided by those actions." 440 U.S. at 182, 99 S.Ct. at 989. Contrary to the majority's assertion, Illinois State Board of Elections, did not provide lower courts with any "further leeway" to examine the merits of issues already decided by the Supreme Court's summary affirmances and dismissals for want of a substantial federal question.
 
 
 58
 Any concern that the Supreme Court had implicitly retreated from Hicks in Mandel and Illinois State Board of Elections should be laid to rest by its decision the same term as Illinois State Board of Elections in Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). In that case, Justice Stewart, citing Hicks reaffirmed that summary affirmances "are, of course, to be taken as rulings on the merits." Id. at 477 n.20, 99 S.Ct. at 749. The Court did not grant lower courts any discretion to decide whether summary affirmances and dismissals for want of a substantial federal question should be accorded binding precedential effect. Rather, the Court adhered to its consistent position that "it is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action." 439 U.S. at 477 n.20, 99 S.Ct. at 749 (emphasis added).[6] Here, the Court was referring to its own reconsideration of summary action, and not reconsideration by lower courts.
 
 
 59
 Therefore, as Professor Moore has observed, Mandel and Illinois State Board of Elections did not signal a retreat from the Hicks doctrine:
 
 
 60
 In sum, (after discussing Mandel and Illinois State Board of Elections), dismissals of appeals from state courts for want of a substantial federal question and summary affirmances of lower federal court judgments for like reason are decisions on the merits, and are binding upon lower courts, in spite of the fact that such dispositions are made on the basis of the appellant's jurisdictional statement and the appellee's motion to dismiss or affirm, without oral argument or full briefs on the merits.
 
 
 61
 12 Moore's Federal Practice P 400.05-1, at 4-25 (2d ed. 1980) (footnotes omitted) (emphasis added).
 
 II.
 
 62
 Applying Hicks and its progeny to this case, we are required to examine the "specific challenges presented in the statement of jurisdiction" in Caulk to determine if the Supreme Court's dismissal for want of a substantial federal question in that case precludes us from reaching the merits of Lecates' appeal. I conclude that the issues raised in Caulk are indistinguishable from those raised in this appeal.
 
 
 63
 The jurisdictional statement in Caulk presented three questions:
 
 
 64
 1. Whether 10 Del.C. § 9578 which makes a prerequisite for an appeal from a Justice of the Peace Court the posting of a security bond within 15 days in the amount of the judgment and costs denies to indigents the equal protection of the law as guaranteed by the fourteenth amendment.
 
 
 65
 2. Whether said statute arbitrarily discriminates against all defendants of the Justice of the Peace in violation of the equal protection clause.
 
 
 66
 3. Whether said statute denies to indigents the due process of law guaranteed by the fourteenth amendment in that it arbitrarily and capriciously denies to indigents access to the courts and an opportunity to appeal.[7]
 
 
 67
 Thus, I note that question three presented to the Supreme Court the precise due process question that the majority now decides.
 
 
 68
 The majority seeks to distinguish Caulk by claiming that the due process claim raised in that case was limited to deprivation of the right to appeal, and did not challenge the question of the right to jury trial nor the right to a legally trained judge.[8] However, the Caulk jurisdictional statement addressed these two specific due process claims:
 
 
 69
 In Delaware defendants in the Justice of the Peace Court have no choice in going to that court or another court where they would have a right to a Judge learned in the law and a trial by Jury. Yet a losing indigent litigant with an unskilled Judge has no meaningful right to appeal.
 
 
 70
 Jurisdictional statement at 8, reprinted in Appendix for Appellant at 10f. Furthermore, it argued that "a defendant in the Justice of the Peace Court has no right to a jury trial (there being no removal statute in Delaware) and has no right to a judge learned in the law (none of the 53 Justices of the Peace is a graduate of a law school)." Jurisdictional Statement at 9, reprinted in Appendix for Appellant at 10f. Thus, by dismissing Caulk's appeal for want of a substantial federal question, the Supreme Court has already squarely decided the "precise issues" of Lecates' appeal.[9]
 
 
 71
 The majority also asserts that the Court's notation of probable jurisdiction in Patterson v. Warner, 371 F.2d 1362 (S.D.W.Va.1972), prob. juris. noted, 411 U.S. 905, 93 S.Ct. 1533, 36 L.Ed.2d 194 (1973), represented a "doctrinal development"[10] that tempered the effect of Caulk. In Patterson the Court never reached the merits of the constitutional challenge to West Virginia's double appeal bond requirement, remanding the case because of an intervening change in state law. The majority would have us say that this notation of probable jurisdiction represented a reversal by the Supreme Court of its views concerning the constitutionality of appeal bond statutes. I cannot read Patterson as a "doctrinal development freeing the lower courts from the strictures of the Hicks v. Miranda rule." Although the jurisdictional statement in Patterson did raise due process questions concerning an indigent's right to access to the courts and appeal, the Supreme Court's remand of the case prior to plenary review makes it impossible to state with certainty which issues in the jurisdictional statement the Court thought were substantial. The Court's mere notation of probable jurisdiction did not constitute "full consideration" of a question that had been the subject of summary action in Caulk. Confederated Bands and Tribes, 439 U.S. at 77 n.20, 99 S.Ct. at 749.[11]
 
 
 72
 Moreover, the Court's per curiam opinion accompanying its remand in Patterson included a citation to Lindsey v. Normet.[12] I agree with the district court's judgment that "(t)he most reasonable interpretation of the court's remark and its citation to Lindsey v. Normet, a case which struck down a double bond requirement applied in forcible entry and detainer actions, is that the court was concerned with the unique problems posed by a double bond requirement." Lecates v. Justice of the Peace Court No. 4, No. 76-295, slip op. at 6 (D.Del. July 12, 1977) (emphasis original). As Judge Stapleton observed, "I find no suggestion (in Patterson) that the court intended to review the broader question of the constitutionality of appeal bonds in general." Id.[13]
 
 
 73
 Therefore, I do not believe that the Supreme Court's notation of probable jurisdiction in Patterson represented a reversal of Caulk and would find appellant's due process challenge to be foreclosed by the latter case.
 
 III.
 
 74
 Appellant also advances two equal protection challenges to the appeal bond statute: 1) the bond requirement denies indigents equal access to appeal in a court of record and thereby violates Lecates' right to equal protection; and 2) the bond requirement violates his right to equal protection because similarly situated indigent defendants in courts of record receive greater procedural protection than those in Justice of the Peace courts.
 
 
 75
 Lecates' first equal protection claim, that indigents are denied the right to appeal that is available to more affluent litigants, was squarely presented to the Supreme Court in Caulk and is foreclosed by that case. See text accompanying note 7 supra.
 
 
 76
 The essence of appellant's second equal protection argument is that he received fewer procedural safeguards as a defendant in the Justice of the Peace Court than he would have as a defendant in the Superior or Common Pleas courts. Even if we assume, arguendo, that appellant's assertion is correct, it does not make out a successful claim under the Equal Protection Clause.
 
 
 77
 State laws are entitled to a presumption of validity against attack under the Equal Protection Clause unless they bear no rational relationship to a permissible state objective. Parham v. Hughes, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979). No stricter scrutiny than rationality will be employed unless the state creates classifications that are "suspect," Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944) or impinge upon a "fundamental right." San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33-34, 93 S.Ct. 1278, 1296-1297, 36 L.Ed.2d 16 (1973). Here, the allegedly disfavored class of Justice of the Peace Court defendants clearly is not suspect, United States v. Carolene Products Company, 304 U.S. 144, 153 n.4, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938), nor is there a fundamental right to any particular mode of resolving civil disputes. See Country-Wide Insurance Company v. Harnett, 426 F.Supp. 1030, 1032 (S.D.N.Y.), aff'd. 431 U.S. 934, 97 S.Ct. 2644, 53 L.Ed.2d 252 (1977) (no basic constitutional right to litigate all disputes); Cf. United States v. Kras, 409 U.S. 434, 444-45, 93 S.Ct. 631, 637, 34 L.Ed.2d 626 (1973) (right to discharge in bankruptcy is not fundamental, stressing availability of alternative procedures). Therefore, the Delaware Justice of the Peace Court scheme must be upheld against equal protection attack if it has a rational basis.
 
 
 78
 I find that there is a rational and permissible basis for Delaware's decision to establish Justice of the Peace courts as a streamlined, alternative forum to courts of record. The Justice of the Peace Court provides litigants with an inexpensive and expedited means of resolving petty disputes. Moreover, as the district court observed:
 
 
 79
 Delaware also provides that one who is determined by this expedited process to be liable to his opponent may have access to the full panoply of procedural rights so long as he or she provides assurance that payment will be forthcoming after the time necessary to afford those protections has been consumed.
 
 
 80
 Lecates v. Justice of the Peace Court No. 4, No. 76-295, slip op. at 6 (D.Del. December 12, 1979). Accordingly, I find no violation of equal protection of the laws.
 
 IV.
 
 81
 For the foregoing reasons, I would affirm the judgment of the district court.
 
 
 
 [1]
 The jurisdiction of the magistrate courts in debt actions is limited to claims for $1,500 or less. The bank purposefully chose to forego its right to the full amount owed in order to have the matter decided in the quickest and least expensive forum for resolving disputes
 
 
 [2]
 Lecates demanded and received a bill of particulars signed by an employee of Sussex Trust. This document simply made references to the existence of the original note and security agreement, the repossession and the second sale of the Chevrolet to the auto dealer. The bill of particulars also stated, as a cause of action, that Sussex "entered present court action to recover $1,500 under magistrate system to avoid costly Superior Court attorney fees on doubtful loans."
 
 
 [3]
 At the time of the hearing, although the question had not yet been addressed in Delaware courts, several states had held that a violation of the notice provisions of the U.C.C. barred the creditor from recovering a deficiency. See e. g. Gurwitch v. Luxurest Furn. Mfg. Co., 233 Ga. 934, 214 S.E.2d 373 (1975); Almonetto v. Keepes, 501 P.2d 1017 (Wyo.1972); Skeels v. Universal C.I.T. Credit Corp., 222 F.Supp. 696 (W.D.Pa.1963). The Delaware Supreme Court has now adopted the position that a failure to give notice of disposition bars a deficiency. Wilmington Trust Co. v. Connors, Del.Supr., 415 A.2d 773 (1980)
 
 
 [4]
 The trial court made a finding of fact that Lecates' financial condition was the reason for his inability to secure a bond. In light of the facts recounted above, this finding is not clearly erroneous
 
 
 [5]
 408 U.S. 901, 92 S.Ct. 2501, 33 L.Ed.2d 327 (1972), dismissing for want of a substantial federal question 281 A.2d 24 (Del.1971)
 
 
 [6]
 See, e. g., Comment, The Precedential Weight of a Dismissal by the Supreme Court for Want of a Substantial Federal Question: Some Implications of Hicks v. Miranda, 76 Colum.L.Rev. 508 (1976), counseling lower courts to examine the precise questions presented to avoid giving summary affirmances a scope beyond that necessitated by the actual facts of the case. This suggestion has now prevailed with the Supreme Court. See pp. 903-904 infra
 
 
 [7]
 Sidle v. Majors, 429 U.S. 945, 97 S.Ct. 366, 50 L.Ed.2d 316 (1976) (Brennan and Marshall, JJ., dissenting from denial of certiorari); Colorado Springs Amusements, Ltd. v. Rizzo, 428 U.S. 913, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976) (Brennan, J., dissenting)
 
 
 [8]
 Colorado Springs Amusement, supra; Fusari v. Steinberg, 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975)
 
 
 [9]
 In several cases subsequent to Hicks the Court reverted to the looser standard of Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which counsels that summary affirmances are not entitled to the same precedential weight or deference extended to rulings accompanied by full written expositions. Thus, in these cases the Court reexamined the merits of claims it had previously dismissed summarily. See, e. g., Caban v. Mohammed, 441 U.S. 380, 390 n.9, 99 S.Ct. 1760, 1767, 60 L.Ed.2d 297 (1979); Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976)
 The evolution away from the Hicks standard is detailed in Linzer, The Meaning of Certiorari Denials, 79 Colum.L.Rev. 1227, 1294-1299 (1979).
 
 
 [10]
 Justice Brennan, concurring with the per curiam opinion in Mandel, succinctly emphasized the import of the decision: it adopted his once dissenting view, it differed significantly from the unquestioning rule in Hicks, and it set forth guidelines for lower courts:
 In a dissent from the denial of certiorari in Colorado Springs Amusements, Ltd. v. Rizzo, 428 U.S. 913, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976), I stated why, in my view, the federal and state courts should give "appropriate, but not necessarily conclusive, weight to our summary dispositions," id., at 923, 96 S.Ct. at 3233, rather than be required, as the Court held in Hicks, "to treat our summary dispositions of appeals as conclusive precedents regarding constitutional challenges to like state statutes or ordinances." 428 U.S. at 913, 96 S.Ct. at 3229.
 The Court by not relying on our summary affirmance in Tucker v. Salera, 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), and Auerbach v. Mandel, 409 U.S. 808, 93 S.Ct. 55, 34 L.Ed.2d 69 (1972), effectively embraces that view, and vividly exposes the ambiguity inherent in summary dispositions and the nature of the detailed analysis that is essential before a decision can be made whether it is appropriate to accord a particular summary disposition precedential effect. After today, judges of the state and federal systems are on notice that, before deciding a case on the authority of a summary disposition by this Court in another case, they must (a) examine the jurisdictional statement in the earlier case to be certain that the constitutional questions presented were the same and, if they were, (b) determine that the judgment in fact rests upon decision of those questions and not even arguably upon some alternative nonconstitutional ground. The judgment should not be interpreted as deciding the constitutional questions unless no other construction of the disposition is plausible. In other words, after today "appropriate, but not necessarily conclusive, weight" is to be given this Court's summary dispositions.
 432 U.S. at 179-180, 97 S.Ct. at 2242.
 No Justice in any respect questioned Justice Brennan's explanation.
 
 
 [11]
 Lecates' claims are therefore more analogous to the contentions successfully advanced in Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). In Boddie, the Supreme Court held that due process protected the right of indigent divorce plaintiffs to gain access to the state controlled judicial system for dissolving marriages. The Court developed this right of access for plaintiffs seeking divorce by comparing their relationship to the state-monopolized process with that of civil defendants. See text at pp. 905-907 infra
 
 
 [12]
 The dissent suggests that the notation of probable jurisdiction has no significance. Typescript at 9 & n.10. Noting probable jurisdiction, however, is the procedure by which the Supreme Court indicates that an appeal presents substantial issues worthy of briefing and consideration on the merits by the full Court. It is the counterpart for appeals of the grant of the writ of certiorari in discretionary review situations. The Court's estimation that the issues raised in a jurisdictional statement warrant plenary consideration is certainly deserving of some note by lower courts. This would appear to be especially so in a case such as the one at hand, where we must ascertain whether certain constitutional issues are "substantial." An action by the Court indicating that substantial questions are presented by a particular sort of constitutional attack on a state statute similar to the one before us is relevant to the resolution of the question facing us
 
 
 [13]
 Jurisdictional statement, Patterson v. Warner, No. 72-5830, at 11
 
 
 [14]
 The Supreme Court never reached the merits in Patterson, because the state legislature amended the statute while the matter was pending and the Court then remanded the case, 415 U.S. 303, 94 S.Ct. 1026, 39 L.Ed.2d 343 (1974). However, the remand would appear to have no effect on the original determination reached by the Supreme Court when it noted jurisdiction, that the issue raised was an open one. If the Court believed that the issue was ruled by Caulk, it probably would have so stated
 
 
 [15]
 As retired Justice Clark warned while sitting on the Fourth Circuit, "an unquestioning application of the Hicks rule can lead to nothing but mischief and place an unnecessary restraining hand on the progress of Federal constitutional adjudication." Hogge v. Johnson, 526 F.2d 833, 836 (4th Cir. 1975) (Clark, J., concurring)
 
 
 [16]
 The Court stated that
 ___although they assert here due process rights as would-be plaintiffs, we think appellants' plight, because resort to the state courts is the only avenue to dissolution of their marriages, is akin to that of defendants faced with exclusion from the only forum effectively empowered to settle their disputes. Resort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court. For both groups this process is not only the paramount dispute-settlement technique, but, in fact, the only available one. In this posture we think that this appeal is properly to be resolved in light of the principles enunciated in our due process decisions that delimit rights of defendants compelled to litigate their differences in the judicial forum.
 401 U.S. at 376, 91 S.Ct. at 785.
 The Court in Boddie also relied on the line of cases striking down financial barriers to criminal defendants' access to appellate review. The basic principle of these cases is that "there can be no equal justice where the kind of trial a man gets depends on the amount of money he has." Griffin v. Illinois, 351 U.S. 12, 19, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956). This principle should also apply to an involuntary civil defendant such as Lecates. An individual in his position is threatened with loss or attachment of wages, and personal or real property. He is also faced with the prospect that a cloud will be imposed on his future ability to obtain employment or credit for purchasing essentials. This may be nearly as grievous a loss as the temporary loss of liberty facing the criminal defendant in Griffin. See Lee v. Habib, 424 F.2d 891 (D.C.Cir.1970).
 
 
 [17]
 See, Note, The Heirs of Boddie: Court Access for Indigents After Kras and Ortwein, 8 Harv.Civ.Rts.Civ.Lib.L.Rev. 571, 578-79 (1978)
 
 
 [18]
 It is a venerable and recurring theme of our jurisprudence that "due process of law signifies a right to be heard in one's defence," Hovey v. Elliott, 167 U.S. 409, 417, 17 S.Ct. 841, 42 L.Ed. 215 (1897). See also, Windsor v. McVeigh, 93 U.S. 274, 277, 23 L.Ed. 914 (1876); Baldwin v. Hale, 1 Wall. 223, 17 L.Ed. 531 (1864)
 
 
 [19]
 Cf. Greenholtz v. Inmates of the Nebraska Penal Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2523, 49 L.Ed.2d 451 (1976); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (cases where the extent of the process, or entitlement, guaranteed by the state informed the resolution of the federal due process question)
 
 
 [20]
 Cf. Hopkins v. Justice of the Peace Court, 342 A.2d 243 (Del.Super.Ct.1975), holding the Landlord-Tenant Act inconsistent with the state constitution's guarantee of a jury trial to the extent that it placed rent collection and eviction proceedings in the JP court without providing a right to a de novo trial in the courts of record
 
 
 [21]
 Thus, after North v. Russell, it was held in one state that due process will not tolerate a lay-judge system where there is no unconditional right to a trial de novo in the courts of record. State v. Dunkerly, 134 Vt. 523, 365 A.2d 131 (1976)
 
 
 [22]
 As one commentator noted over fifty years ago:
 With no training in the law, no training in the process of judicial thought, and no mental habit of mind acquired by constant experience in legal reasoning, it would indeed be strange if a (lay judge) did not treat each case as a unique proposition. He has no category or class into which he may place it, no analogies from which to draw to solve the new problem before him. He has no legal rules, principles or standards by which to judge the merits of the controversy to be decided. Wholly unlike the judge who is trained in the law, he has no precedents to guide him. In deciding the cause before him, the lay judge is necessarily limited by his own personal experience acquired in the short span of a single lifetime. He cannot call on the legal experience of the ages to assist him but is helpless to do any more than apply his own personal notions of right and wrong to the case at hand. The justice which such tribunal is capable of dispensing is but the outcropping of the experiences of a personality, often limited and warped by passion and prejudice, and at best, as variable as the personalities of the justices who comprise (the system).... Such justice is not justice at all. It is unequal, uncertain and capricious.
 Smith, the Justice of the Peace System, 15 Cal.L.Rev. 118, 127-28 (1927).
 More recently, a nonlawyer judge described the difference in her performance on the bench after she went through a legal training course. Before the course, she analyzed cases according to public opinion, or her view of the "morality" of the situation, or based on her "common sense reaction." After the course, however, she realized that her role was "to follow and apply the Constitution and the law, regardless of (her) values or public opinion." Ashman & Chapin, Is the Bell Tolling for Nonlawyer Judges?, 59 Judicature 417 (1976).
 
 
 [23]
 A judge on the Washington Supreme Court observed:
 Training in the broad scope of law and its history and subjection to the mental discipline required by such a course of study provides the foundation for rule of law rather than rule of fiat. Lacking this training the untrained judge by necessity may apply only his own standards. Further, where he errs in his understanding of the law he remains uncorrected, because no record is made of proceedings in district and municipal courts and the lay judge's actions are not reviewed in the de novo trial of a defendant's case. His misunderstanding is perpetuated.... (S)uch a system (is) constitutionally unacceptable.
 Young v. Konz, 91 Wash.2d 532, 588 P.2d 1360, 1369 (1979) (Utter, J., dissenting).
 
 
 [24]
 Ryan & Guterman, Lawyer vs. Nonlawyer Town Justices: An Empirical Footnote to North v. Russell, 60 Judicature 272 (1977)
 
 
 [25]
 Id. at 277
 
 
 [26]
 Having concluded that Lecates is entitled to the relief he seeks on the ground that his due process rights were violated, we have no occasion to express an opinion regarding the merits of his equal protection claims
 
 
 [1]
 Del.Code Ann. tit. 10 §§ 9571-72 provides:
 § 9571. Time for appeals; security.
 (a) An appeal shall be allowed by the justice at any time within 15 days from the day of giving the judgment and not after, counting that day as one, upon the party entitled to the appeal or his agent praying it.
 (b) The party appealing shall offer security in such sum as the justice deems sufficient to cover the judgment appealed from and the costs on the appeal.
 (c) An appeal shall be allowed to executors or administrators without security.
 (d) When the plaintiff is the appellant and no counterclaim is involved, such plaintiff need offer no security to cover the judgment appealed from or the costs; provided, that the costs of the proceedings before the justice are paid before the appeal is taken and the advance deposit for costs provided in the Superior Court Rules is made. (Code 1852, §§ 2139, 2141; Code 1915, § 4035; 34 Del.Laws, c. 223, § 1; Code 1935, § 4522; 10 Del.C.1953, § 9578; 54 Del.Laws, c. 242.)
 § 9572. Entry of security on appeal.
 (a) The justice of the peace who allows an appeal shall make an entry of the security offered on appeal as follows:
 "On the day of , A.D. , the said A. B. appeals and C. D. becomes surety in the sum of Dollars, that the said appeal shall be prosecuted with effect and also that any judgment which shall be rendered against the said A. B. or his executors or administrators upon the said appeal shall be satisfied, and the said C. D. hereby authorizes and empowers the Superior Court of the State of Delaware in and for County to give judgment against me, the said C. D., or my executors or administrators, as surety, for the same amount as shall be given against the said A. B., or his executors or administrators, and such judgment, if and when entered, shall be a lien upon my real estate, and may be collected and treated as any other judgment in said Superior Court."
 (b) The entry of security shall be signed by the sureties or it shall be void. (Code 1852, § 2140; 18 Del. Laws, c. 678, § 1; Code 1915, § 4035; 34 Del.Laws, c. 223, § 1; Code 1935, § 4522; 10 Del.C. 1953, § 9579.)
 
 
 [2]
 A dismissal of an appeal from a federal or state court for want of a substantial question is necessarily a disposition on the merits because it lies within the Supreme Court's obligatory jurisdiction under 28 U.S.C. § 1257 (1976). See 12 Moore's Federal Practice P 400.05-1, at 4-18 (2d ed. 1980)
 
 
 [3]
 The distinction between a dismissal for want of a substantial federal question and a summary affirmance is largely historical; there is no practical difference between them. See 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure: Jurisdiction § 4014 at 639 (1977)
 
 
 [4]
 The Court had noted in Hicks that "(a)scertaining the reach and content of summary actions may itself present issues of real substance." 422 U.S. at 345 n.14, 95 S.Ct. at 2289
 
 
 [5]
 The majority's reading of Mandel is based on Justice Brennan's concurring opinion. Typescript at 9 & n.10. However the concurrence was just that a concurring opinion which was not joined by any other member of the Court
 
 
 [6]
 In Edelman v. Jordan, 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974), the Court recognized that it may itself reexamine the authority of summary dispositions more readily than authority established by full-scale argument and disposition. 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure: Jurisdiction § 4014 (1977). Accord, Caban v. Mohammed, 441 U.S. 380, 390 n.9, 99 S.Ct. 1760, 1767, 60 L.Ed.2d 297 (1979), Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 309 n.1, 96 S.Ct. 2562, 2564, 49 L.Ed.2d 520 (1976)
 
 
 [7]
 Jurisdictional statement, State ex rel. Caulk v. Nichols, No. 71-5302, at 3, reprinted in Appendix for Appellant at 5f
 
 
 [8]
 I am skeptical that this case presents anything more than a challenge to the constitutionality of the appeal bond requirement. If there were no bond requirement, the de novo review in the Superior Court would afford litigants the full panoply of due process rights including the right to the jury trial and a legally trained judge Cf. North v. Russell, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976)
 
 
 [9]
 The majority also seeks to distinguish this case from Caulk by noting the factual distinctions between them. No Supreme Court case has ever limited the precedential effect of a summary affirmance or dismissal for want of a substantial federal question to the precise facts presented, even though some commentators have argued that the reach and content of summary dispositions should be so limited. Comment, The Precedential Weight of a Dismissal by the Supreme Court for Want of a Substantial Federal Question: Some Implications of Hicks v. Miranda, 76 Colum.L.Rev. 508, 529 (1976)
 
 
 [10]
 In Hicks the Court advised that "inferior courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise." 422 U.S. at 344, 95 S.Ct. at 2289
 
 
 [11]
 As the leading treatise on Supreme Court practice explains, a notation of probable jurisdiction merely means that the Court has determined that an appeal should be fully briefed and argued and that "no jurisdictional problems seems apparent." Moreover, "(s)ince only 'probable jurisdiction' has been noted ... such an order does not foreclose argument on a jurisdictional point that a party may wish to raise." R. Stern & E. Gressman, Supreme Court Practice 382 (5th ed. 1978)
 
 
 [12]
 Patterson v. Warner, 415 U.S. 303, 303-04, 94 S.Ct. 1026, 39 L.Ed.2d 343 (1974), where the Court stated:
 We noted probable jurisdiction in this case, 411 U.S. 905 (93 S.Ct. 1533, 36 L.Ed.2d 194) (1973), because it appeared to present a significant issue under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as to the validity of that provision of W.Va.Code Ann. § 50-15-2 (1966), requiring a double bond as a condition for an appeal from a judgment entered by a justice of the peace in a civil case. See Lindsey v. Normet, 405 U.S. 56, 74-79 (92 S.Ct. 862, 874-877, 31 L.Ed.2d 36) (1972). Id. (footnote omitted).
 
 
 [13]
 The district court's reading of the Lindsey citation is supported by the Supreme Court's clear indication that it found the doubling required by the Oregon statute to be offensive:
 It cannot be denied that the double-bond requirement heavily burdens the statutory right of an FED defendant to appeal. While a State may properly take steps to insure that an appellant post adequate security before an appeal to preserve the property at issue, to guard a damage award already made, or to insure a landlord against loss of rent if the tenant remains in possession, the double-bond requirement here does not effectuate these purposes since it is unrelated to actual rent accrued or to specific damage sustained by the landlord.
 405 U.S. at 77, 92 S.Ct. at 876.