**In re Lee KANDU and Ann C. Kandu, Debtors.**

**No. 03–51312.**

United States Bankruptcy Court, W.D. Washington.

Aug. 17, 2004.

---

Lee Kandu, Castle Rock, WA, pro se.

Ann C. Kandu, Castle Rock, WA, pro se.

Tanya M. Pemberton, Tacoma, WA, for Debtors.

Gregory G. Katsas, U.S. Dept. of Justice, Washington, DC, Marjorie S. Raleigh, U.S. Trustee, Seattle, WA, for U.S. Trustee.

## MEMORANDUM DECISION

PAUL B. SNYDER, Bankruptcy Judge.

This matter came before the Court pursuant to an Order to Show Cause for Improper Joint Filing under 11 U.S.C. § 302. Based on the arguments presented and considering the pleadings submitted, the Court's findings of fact and conclusions of law are as follows:

## FINDINGS OF FACT

■ Lee Kandu and Ann C. Kandu (Debtors), two women, who are United States citizens, were married in British Columbia, Canada, on August 11, 2003. On October 31, 2003, Lee Kandu (Debtor) filed pro se a voluntary petition for relief under Title 11, Chapter 7. Ann C. Kandu was listed on the petition as a joint debtor pursuant to 11 U.S.C. § 302. On December 5, 2003, the Court filed an Order to Show Cause for Improper Joint Filing of unmarried individuals. The Court was advised that on March 25, 2004, Ann C. Kandu died.[1]

The Debtor filed a Memorandum in Support of Debtors' Joint Filing on April 20, 2004, challenging the constitutionality of the Defense of Marriage Act (DOMA), 1 U.S.C. § 7. On April 30, 2004, the United States Trustee (UST) filed a motion for order shortening time and a Motion for Additional Time to file Response Brief and for Certification of Issues to the Attorney General for the State of Washington. On May 7, 2004, the Court granted the motions and certified to the Attorney General of the State of Washington the issue of the constitutionality of RCW 26.04.010 that limits marriage to a husband and wife of the opposite sex. On May 17, 2004, the UST advised an Assistant Attorney General by letter that the Court would address only issues regarding the constitutional challenges to DOMA. For issues concerning the constitutionality of RCW 26.04.010, the Court would at a later date, if necessary, afford the State an opportunity to be heard.

On May 21, 2004, the UST filed its response to the show cause order, and on June 4, 2004, the Debtor filed a reply thereto. On June 10, 2004, the Court heard oral arguments and subsequently took the matter under advisement.

## CONCLUSIONS OF LAW AND DISCUSSION

The Defense of Marriage Act, provides that "[i]n determining the meaning of any

---

1. Pursuant to Fed. R. Bankr.P. 1016, the death of Ann C. Kandu did not abate the Debtors' case under Chapter 7, nor did her death render the issues moot. Rather, in accordance with Fed. R. Bankr.P. 1016, the estate "shall be administered and the case concluded" in the same manner as though the death did not occur.

Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, ... the word 'spouse' refers only to a person of the opposite sex who is a husband or a wife." 1 U.S.C. § 7. The controlling statute, or Act of Congress, in this case is 11 U.S.C. § 302 that governs joint cases for bankruptcy filings. This statute provides that, "[a] joint case under a chapter of this title is commenced by the filing with the bankruptcy court of a single petition under such chapter by an individual that may be a debtor under such chapter *and such individual's spouse.*" 11 U.S.C. § 302(a) (emphasis added).

The Debtor contends that DOMA, as applied to 11 U.S.C. § 302, is unconstitutional. The Debtor specifically argues that excluding same-sex couples from recognition under 11 U.S.C. § 302 violates the Tenth Amendment, the principles of comity, and the Fourth and Fifth Amendments to the U.S. Constitution. The Debtor has not challenged DOMA under the Full Faith and Credit Clause, Article IV, Section I of the U.S. Constitution.

DOMA was signed by President Clinton in 1996. This Court is unaware of any published opinion by a federal court addressing its constitutionality. Thus, the arguments presented by the Debtor as to DOMA's constitutionality are matters of first impression. The issues concerning same-sex marriage, however, are not novel. The constitutional issues, as well as arguments set forth by the parties, have been the subject of recent state court decisions, as well as debate in Congress, state legislatures, and in the academic world.

## I

### TENTH AMENDMENT

The Debtor first argues that DOMA is unconstitutional because it violates the Tenth Amendment to the U.S. Constitution. She maintains that DOMA is unenforceable because it regulates domestic relations, specifically marriage that is a power not granted to Congress in Article I of the U.S. Constitution and, therefore, reserved to the States by the Tenth Amendment.

■■■ The Constitution "establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft,* 501 U.S. 452, 457, 111 S.Ct. 2395, 2399, 115 L.Ed.2d 410 (1991). The federal government's power, however, is expressly limited by the Constitution. *Gregory,* 501 U.S. at 457, 111 S.Ct. at 2399. Those limits are articulated by the Tenth Amendment that provides "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The basic concern of the Tenth Amendment is the "proper division of authority between the federal government and the States." *New York v. United States,* 505 U.S. 144, 149, 112 S.Ct. 2408, 2414, 120 L.Ed.2d 120 (1992). The text of the Tenth Amendment itself does not limit the power of the federal government. *New York,* 505 U.S. at 156–57, 112 S.Ct. at 2418. Rather, the Tenth Amendment requires a court to look at "whether particular sovereign powers have been granted by the Constitution to the Federal Government or have been retained by the States." *New York,* 505 U.S. at 155, 112 S.Ct. at 2417. The Tenth Amendment is implicated when a particular Act of Congress is outside its enumerated powers, infringing on the powers reserved to the States. *See New York,* 505 U.S. at 156, 112 S.Ct. at 2417–18.

In this case, the Debtor argues that the Tenth Amendment is implicated because through DOMA Congress is regulating

marriage, a power that has traditionally been reserved to the States. DOMA defines the term "marriage" and "spouse" for federal purposes as follows:

In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the word "marriage" means only a legal union between one man and one woman as husband and wife, and the word "spouse" refers only to a person of the opposite sex who is a husband or a wife.

1 U.S.C. § 7. DOMA was enacted in response to *Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44 (1993). H.R.Rep. No. 104–664, at 6–7 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2905, 2911. Congress recognized that the Hawaii Supreme Court appeared to be on the verge of requiring the State of Hawaii to issue marriage licenses to same-sex couples. H.R.Rep. No. 104–664, at 2, *reprinted in* 1996 U.S.C.C.A.N. at 2906. Congressional history indicates a profound concern over the consequences such a decision could have on both federal law and the impact it would have on other states. H.R.Rep. No. 104–664, at 2, 6–7, *reprinted in* 1996 U.S.C.C.A.N. at 2906, 2910–11. Particularly, with regard to federal law, "a decision by one State to authorize same-sex marriage would raise the issue of whether such couples are entitled to federal benefits that depend on marital status." H.R.Rep. No. 104–664, at 2, *reprinted in* 1996 U.S.C.C.A.N. at 2906. According to the House Report, "[t]he word 'marriage' appears in more than 800 sections of federal statutes and regulations, and the word 'spouse' appears more than 3,100 times." H.R.Rep. No. 104–664, at 10, *reprinted in* 1996 U.S.C.C.A.N. at 2914. Until recently, Congress did not define the term marriage or spouse in those sections, because it was believed that state and federal definitions of those terms

were consistent, namely, that marriage is the union of one man and one woman. *See* H.R.Rep. No. 104–664, at 10, *reprinted in* 1996 U.S.C.C.A.N. at 2914. In light of *Baehr,* Congress recognized the potential for confusion, adopting DOMA to preserve the traditional definition of marriage intended by Congress for application of federal law. *See* H.R.Rep. No. 104–664, at 10, *reprinted in* 1996 U.S.C.C.A.N. at 2914.

■ DOMA explicitly applies only to federal law. H.R.Rep. No. 104–664, at 29, *reprinted in* 1996 U.S.C.C.A.N. at 2934. Its definitions of marriage and spouse are applicable only to the determination of the meaning of "any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States." 1 U.S.C. § 7. The determination of who may marry, however, continues to be exclusively a function of state law. H.R.Rep. No. 104–664, at 3, *reprinted in* 1996 U.S.C.C.A.N. at 2907.

■ The primary question raised by the Debtor as it concerns the Tenth Amendment is whether DOMA oversteps the boundary between federal and state authority. The Court concludes that the answer in this instance is that it does not. The Tenth Amendment is not implicated because the definition of marriage in DOMA is not binding on states and, therefore, there is no federal infringement on state sovereignty. States retain the power to decide for themselves the proper definition of the term marriage.

The Debtor also argues that Congress may preempt state family law, in favor of a federal standard, only when specific conditions are met. In support, she relies on *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) and *United States v. Yazell,* 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966). In both *Hisquier-*

*do* and *Yazell*, the Court considered whether state law was preempted by federal law because there was a direct conflict between the state and federal policy. *Hisquierdo*, 439 U.S. at 582, 99 S.Ct. at 809; *Yazell*, 382 U.S. at 349, 86 S.Ct. at 505. In this case, unlike the cases cited above, there is no conflict between state and federal policy. Washington State has adopted its own definition of marriage identical to DOMA, defining marriage for state purposes as the legal union of one man and one woman. Preemption is not at issue since federal and Washington state standards remain identical, notwithstanding recent developments.[2] The state and federal definitions of marriage are independent of one another. The states remain free to regulate marriage at a state level, without federal interference. This Court concludes, therefore, that DOMA is consistent with the principles articulated by the Tenth Amendment.

## II

### COMITY

The Debtor next requests this Court to apply the doctrine of comity to validate her marriage for purposes of 11 U.S.C. § 302. She contends that since all of the requirements for a valid marriage in British Columbia, Canada, were met, this Court should recognize the marriage and allow the Debtors to file a joint petition under 11 U.S.C. § 302.

■■■■ As a general matter, the laws of one nation do not have force or effect beyond its borders. *Hilton v. Guyot*, 159 U.S. 113, 163, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895). The extent to which the legislative, executive, or judicial acts of one nation will be recognized and enforced within another nation, depends on what has been

termed the "comity of nations." *Hilton*, 159 U.S. at 163, 16 S.Ct. at 144.

> 'Comity,' in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience....

*Hilton*, 159 U.S. at 163–64, 16 S.Ct. at 143. Comity is voluntary. *Hilton*, 159 U.S. at 165, 16 S.Ct. at 144. The Debtor's assertion that comity is mandatory is simply not supported by case law. Although there may be a preference for comity when the laws of nations are in alignment, no such preference exists when the laws of a foreign nation are contrary to the sovereign's policy or prejudicial to its interests. *Hilton*, 159 U.S. at 164–65, 16 S.Ct. at 144. The Supreme Court has concluded, in the event of a conflict of laws between nations, a court must prefer the laws of its own nation. *Hilton*, 159 U.S. at 165, 16 S.Ct. at 144.

■■■ The Debtors were legally married according to the laws of British Columbia, Canada. However, unlike British Columbia, the United States does not recognize same-sex marriages. DOMA states that, for federal purposes, marriage is solely the union between one man and one woman. Particularly relevant, the Supreme Court has stated that, "[a] judgment affecting the status of persons, such as a decree confirming or dissolving a marriage, is recognized as valid in every country, unless contrary to the policy of its own law." *Hilton*, 159 U.S. at 167, 16 S.Ct. at 145. Because the British Columbia policy and the United States policy concerning mar-

---

**2.** *See* Superior Court for King County, Washington in *Andersen v. King County*, No. 04–2–

04964–4–SEA, 2004 WL 1738447 (Aug. 4, 2004).

riage directly conflict, this Court must prefer its own laws finding DOMA controlling in this case.[3]

 The Debtor also argues that the rules of statutory construction require this Court to recognize the Debtors' same-sex marriage. She maintains that courts must construe statutes to avoid unreasonable interference with the authority of other nations. This Court disagrees. In determining the scope of a statute, a court must first look to the language of the statute. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). When the statute's language is clear, it is the court's function to enforce the statute according to its terms. *E.g., Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6, 120 S.Ct. 1942, 1947, 147 L.Ed.2d 1 (2000) (citing *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989)). The language of DOMA is clear and unambiguous. It states that, in all acts of Congress, the term "marriage" means only the legal union between one man and one woman, and the word "spouse" refers only to a person of the opposite sex that is a husband or wife.

### III

### FOURTH AMENDMENT

The Debtor next alleges that DOMA violates the Fourth Amendment to the U.S. Constitution because it takes federal rights and responsibilities from married same-sex couples. Although the Debtor used the word "take" that suggests an argument under the Takings Clause of the Fifth Amendment to the U.S. Constitution, the Debtor made clear in her memorandum, as well as at oral argument, that she intended her argument to fall within the search and seizure provisions of the Fourth Amendment.

 The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Historically, the applicability of the Fourth Amendment was limited to the criminal context. *Gerstein v. Pugh,* 420 U.S. 103, 125 n. 27, 95 S.Ct. 854, 869, 43 L.Ed.2d 54 (1975). It was designed to "safeguard the rights of those accused of criminal conduct." *Gerstein,* 420 U.S. at 125 n. 27, 95 S.Ct. at 869. More recently, the Fourth Amendment has been applied in the civil context as well. *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 51, 114 S.Ct. 492, 500, 126 L.Ed.2d 490 (1993). In its expansion, however, the Supreme Court indicated that the Fourth Amendment properly applies in the civil context only when the purpose of the governmental action is within the traditional meaning of search and seizure. *James Daniel Good Real Prop.,* 510 U.S. at 52, 114 S.Ct. at 500.

 It appears the only issue raised by the Debtor is whether the government's failure to recognize her same-sex marriage, for federal purposes, consti-

---

**3.** The Debtor argues that the fact that the United States definition of marriage is different than the British Columbia definition of marriage is not enough to justify disregarding the principles of comity. She asserts that in order to withhold recognition of foreign laws, there must be a strong and clear countervailing public policy. According to the House Report, the purpose of DOMA was to defend the institution of traditional, heterosexual marriage. H.R.Rep. No. 104–664, at 12, *reprinted in* 1996 U.S.C.C.A.N. at 2916. This Court concludes, in reviewing the legislative history, that the federal government has announced a strong and clear countervailing policy concerning marriage that justifies disregarding comity.

tutes an unlawful seizure of the Debtors' property interests in federal benefits. According to its traditional definition, a seizure under the Fourth Amendment occurs when the government interferes with an individual's possessory interest in property in some meaningful way. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). In order for the Debtor's Fourth Amendment unlawful seizure argument to succeed, she must first establish an ownership interest in the property seized. *See Jacobsen*, 466 U.S. at 113, 104 S.Ct. at 1656. A property interest requires more than an abstract need or desire for the benefits claimed. *Greene v. Babbitt*, 64 F.3d 1266, 1271 (9th Cir.1995). Rather, the Debtor must have " 'a legitimate claim of entitlement' " to the benefits. *Greene*, 64 F.3d at 1271 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

█ In this case, Congress enacted a statute which defines marriage, for federal purposes, as one man and one woman. 1 U.S.C. § 7. Although the Debtor claims that DOMA deprives same-sex couples of the federal benefits currently enjoyed by married opposite-sex couples, she has failed to demonstrate a possessory interest in such benefits, such that would be entitled to protection under the Fourth Amendment. The Debtor has cited no authority to support her view as to the application of the Fourth Amendment. She conceded at oral argument that her reasoning has no legal basis. In absence of case law to the contrary, this Court concludes that there is no violation of the Fourth Amendment.

## IV

### DUE PROCESS AND EQUAL PROTECTION

The Debtor asserts that DOMA violates both the due process and equal protection guarantees of the Fifth Amendment to the U.S. Constitution. Specifically, she argues that the fundamental right to marry includes the right to marry someone of the same sex and that the classification created by DOMA is entitled to heightened scrutiny by the courts. The UST asserts that there is no controlling authority to support either of the Debtor's contentions, and that moreover, there is controlling authority by the Supreme Court to the contrary, articulated in *Baker v. Nelson*, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972).

### A. Baker v. Nelson

The UST contends that in *Baker*, the Supreme Court considered the Debtor's constitutional challenges to legislation restricting marriage to a man and a woman, and held that this restriction violates neither due process nor equal protection. The UST argues that, because no Supreme Court or Ninth Circuit decision has reached a different conclusion since *Baker*, that case is binding precedent and dispositive of the issues before this Court. *See Adams v. Howerton*, 486 F.Supp. 1119, 1124 (C.D.Cal.1980) (recognizing that *Baker* is binding precedent regarding the constitutionality of a state court judgment prohibiting two people of the same sex from marrying each other), *aff'd*, 673 F.2d 1036 (1982).

In the underlying case, *Baker v. Nelson*, 291 Minn. 310, 191 N.W.2d 185 (1971), *appeal dismissed*, 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972), the Minnesota Supreme Court considered a constitutional challenge under the First, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution limiting marriage to one man and one woman. The couple at issue had been denied a marriage license on the basis that the couple was of the same sex. *Baker*, 191 N.W.2d at 185. The court re-

jected the argument that the right to marry without regard to the sex of the parties is a fundamental right. *Baker,* 191 N.W.2d at 186. In so holding, the court concluded that the statute did not violate the Due Process Clause. Likewise, the court rejected the argument that the state statute violated the Equal Protection Clause.

Invoking the Supreme Court's mandatory appellate jurisdiction (since repealed), the same-sex couple sought review of the state court ruling, arguing that denial of the marriage license violated the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The Supreme Court, which had no discretion to refuse adjudication of the case on its merits,[4] *see Hicks v. Miranda,* 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975), summarily decided the case and dismissed the appeal "for want of a substantial federal question." *Baker,* 409 U.S. 810, 93 S.Ct. 37.

 With respect to the effect of the Supreme Court's summary decision in *Baker,* the Supreme Court has explained that lower courts are bound by summary actions on the merits by the Court. *Hicks,* 422 U.S. at 344–45, 95 S.Ct. at 2289.

Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions.... Summary actions, however, ... should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved.

*Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240–41, 53 L.Ed.2d 199 (1977). When the Supreme Court summarily affirms, it " 'affirm[s] the judgment but not necessarily the reasoning by which it was reached.' " *Mandel,* 432 U.S. at 176, 97 S.Ct. at 2240 (quoting *Fusari v. Steinberg,* 419 U.S. 379, 391, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975) (Burger, J. concurring) (footnote omitted)).

 Nonetheless, the Supreme Court has limited the scope of the precedential value of such summary decisions. "[T]he precedential effect of a summary affirmance can extend no farther than 'the precise issues presented and necessarily decided by those actions.' " *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 182, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979) (quoting *Mandel,* 432 U.S. at 176, 97 S.Ct. at 2240). Furthermore, "[q]uestions which 'merely lurk in the record,' ... are not resolved, and no resolution of them may be inferred." *Illinois State Bd. of Elections,* 440 U.S. at 183, 99 S.Ct. at 989, (quoting *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925)). One court has explained that "the precedential value of a summary disposition by the Supreme Court is to be confined to the exact facts of the case and to the precise question posed in the jurisdictional statement." *Lecates v. Justice of the Peace Court No. 4 of Del.,* 637 F.2d 898, 904 (3rd Cir.1980). Thus, before deciding a case on the authority of a summary disposition by the Supreme Court, a judge must,

(a) examine the jurisdictional statement in the earlier case to be certain that the

---

**4.** Contrary to the Debtor's assertion, the Supreme Court did not "decline to review *Bak-* *er"* in 1971.

constitutional questions presented were the same and, if they were,

(b) determine that the judgment in fact rests upon decision of those questions and not even arguably upon some alternative nonconstitutional ground.... "[A]ppropriate, but not necessarily conclusive, weight" is to be given this Court's summary dispositions.

*Mandel,* 432 U.S. at 180, 97 S.Ct. at 2242 (Brennan, J., concurring). When "a summary disposition is applicable, it is a binding precedent." *Lecates,* 637 F.2d at 904.

■ The UST argues that this Court is bound by *Baker* on both the Debtor's due process and equal protection arguments. Before this Court can apply *Baker* as binding precedent, it must examine the jurisdictional statements presented to the Supreme Court that are as follows:

1. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their liberty to marry and of their property without due process of law under the Fourteenth Amendment.

2. Whether appellee's refusal, pursuant to Minnesota marriage statutes, to sanctify appellants' marriage because both are of the male sex violates their rights under the equal protection clause of the Fourteenth Amendment.

3. Whether appellee's refusal to sanctify appellants' marriage deprives appellants of their right to privacy under the Ninth and Fourteen Amendments.

Juris. Statement in *Baker v. Nelson,* October Term, 1972, p. 3.

Determining whether a summary disposition by the Supreme Court is binding precedent is anything but a clear and certain task. The issue in *Baker* was whether a state licensing statute limiting marriage to opposite-sex couples, and thereby excluding same-sex marriage, violated the due process and equal protection provisions of the Constitution. At first impression, this appears to be the same issue the Debtor brings before this Court now: whether DOMA that limits the term "marriage" to two individuals of the opposite sex, and thereby excludes couples of the same sex, violates the due process and equal protection provisions of the Constitution. Yet there are differences that could sufficiently distinguish *Baker* from the current case. For instance, the appellants in *Baker* sought review of the constitutionality of a state marriage licensing statute, while the Debtor here seeks review of subsequently-enacted federal legislation with its own Congressional history that concerns exclusively federal benefits. Additionally, the appellants in *Baker* challenged the statute under the Equal Protection and Due Process Clauses of the Fourteenth Amendment; the Fifth Amendment is at issue here.

The Debtor also argues that even if *Baker* is applicable, intervening Supreme Court decisions have altered the legal landscape so drastically that the case now has little, if any, precedential value regarding the constitutionality of excluding all same-sex couples from the federal rights and benefits[5] associated with marriage. *See Hicks,* 422 U.S. at 344, 95 S.Ct. at 2289 (holding that federal courts must rely on cases summarily decided by the Supreme Court until "doctrinal developments indicate otherwise"). The Debtor relies on *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996), and *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54

5. The Court would note that the only federal benefits and rights at issue in this case are those associated with federal bankruptcy law.

L.Ed.2d 618 (1978) as support for her supposition that the legal landscape has been drastically altered.

Since *Baker*, there has been no decision by the Supreme Court or the Ninth Circuit addressing the constitutionality of a statute limiting marriage to opposite-sex couples. It is recognized, as discussed below, that there has been no binding federal case law holding that same-sex marriage is a fundamental right, that same-sex couples are a suspect or quasi-suspect class, or that marriage laws distinguishing between same-sex and opposite-sex couples cannot pass rational basis review. The Supreme Court's approach to the constitutional analysis of same-sex conduct, however, at least arguably appears to have shifted. This is particularly apparent in light of the Supreme Court's decision in *Lawrence*. See *Lawrence*, 539 U.S. at 586–606, 123 S.Ct. at 2488–98 (Scalia, J., dissenting).

■ The Supreme Court decision in *Illinois State Bd. of Elections* clarifies that "summary dispositions are to be narrowly interpreted and are of limited precedential value." William J. Schneier, *The Do's and Don'ts of Determining the Precedential Value of Supreme Court Summary Dispositions, League of Women Voters v. Nassau County Board of Supervisors*, 51 Brook. L.Rev. 945, 959 (1985). Given the enumerated statutory differences between *Baker* and DOMA, subsequent Congressional history related to DOMA, the limited scope of precedential value of summary affirmations and dismissals, and the possible impact of recent Supreme Court decisions, particularly as articulated in *Lawrence*, this Court concludes that *Baker* is not binding precedent on the issues presented by the Debtors.

### B. Due Process

The Debtor argues that DOMA's exclusion of federal benefits for same-sex marriages infringes on her right to marry someone of the same sex. She contends that this right is guaranteed as a fundamental liberty interest by the Due Process Clause of the Fifth Amendment. Conversely, the UST asserts that there is no controlling authority that recognizes a fundamental right to enter into a same-sex marriage.

■ The Fifth Amendment provides, "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997). If there is a fundamental right to same-sex marriage, this Court must apply a "strict scrutiny" analysis that forbids government infringement on a fundamental liberty interest " 'unless the infringement is narrowly tailored to serve a compelling state interest.' " *Glucksberg*, 521 U.S. at 721, 117 S.Ct. at 2268 (quoting *Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993)). If participation in a same-sex marriage is not a fundamental right, the Court must address the constitutionality of DOMA with a more liberal "rational basis" analysis that requires upholding the legislation if it is rationally related to a legitimate government interest. *Glucksberg*, 521 U.S. at 728, 117 S.Ct. at 2271.

■ Whether same-sex marriage is a constitutionally mandated "fundamental right" is then the first critical inquiry under the Due Process Clause. The Supreme Court has identified the nature of rights that qualify for heightened judicial protection. This includes those fundamental liberties that are " 'implicit in the con-

cept of ordered liberty,' " such that " 'neither liberty nor justice would exist if they were sacrificed.' " *Glucksberg,* 521 U.S. at 721, 117 S.Ct. at 2268 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). The Court has also characterized those liberties as ones that are *"objectively,* 'deeply rooted in this Nation's history and tradition.' " *Glucksberg,* 521 U.S. at 720–21, 117 S.Ct. at 2268 (emphasis added) (quoting *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (plurality opinion)). It is not in dispute that the Supreme Court has held that in addition to the freedoms protected by the Bill of Rights, the "liberty" protected by the Due Process Clause has conferred fundamental right status on marriage. *Glucksberg,* 521 U.S. at 720, 117 S.Ct. at 2267 (citing *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967)).

No federal court, however, has explicitly recognized that this fundamental right to marry extends to a person of the same sex. Accordingly, this Court must determine whether the Debtor has a fundamental right to enter into a same-sex marriage, viewed in light of past Supreme Court decisions holding that there is a fundamental right to marry persons of the opposite sex. The Debtor urges this Court to conclude that there is a fundamental right of same-sex couples to marry, as such a right was implicitly recognized by the Supreme Court in its recent opinion of *Lawrence,* and explicitly by the Supreme Judicial Court of Massachusetts in *Goodridge v. Department of Pub. Health,* 440 Mass. 309, 798 N.E.2d 941 (2003), and by the Superior Court for King County, Washington in *Andersen v. King County,* No. 04–2–04964–4–SEA, 2004 WL 1738447 (Aug. 4, 2004).

The Massachusetts court decision, however, was decided under the Massachusetts Constitution that the Supreme Judicial Court of Massachusetts characterized as being more "protective of individual liberty and equality than the Federal Constitution." *Goodridge,* 798 N.E.2d at 948. The Massachusetts Constitution was also stated as being more protective of "spheres of private life" and less tolerant of government intrusion. *Goodridge,* 798 N.E.2d at 949. Since the *Goodridge* decision granting same-sex marriage licenses was based upon rights stemming from the more protective Massachusetts Constitution, the precedential value of its decision is significantly reduced.

In *Lawrence,* the Supreme Court held that the Due Process Clause of the Constitution protects the right of two individuals of the same sex to engage in mutually consensual private sexual conduct. *Lawrence,* 539 U.S. at 578–79, 123 S.Ct. at 2484. The Debtor argues that the Court's language in this opinion is so broad as to implicitly recognize same-sex marriages. The Debtor points to language in *Lawrence* stating that the Constitution protects "personal decisions relating to *marriage,* procreation, contraception, family relationship, child rearing, and education," and that a gay person "may seek autonomy for these purposes, just as heterosexual persons do." *Lawrence,* 539 U.S. at 559–60, 574–76, 123 S.Ct. at 2474, 2482 (emphasis added).

Contrary to the Debtor's arguments, however, the Supreme Court in *Lawrence* also explicitly stated that the case did "not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter." *Lawrence,* 539 U.S. at 578–79, 123 S.Ct. at 2484. It would appear, then, that the Supreme Court did not intend to extend its holding to include same-sex marriage. Moreover, the Court applied without explanation a rational basis test, rather than

strict scrutiny review required when fundamental rights are at issue. *Lawrence,* 539 U.S. at 578–79, 123 S.Ct. at 2484. Although *Lawrence* could be a preview of the Supreme Court's course in its constitutional analysis of marriage, *see Lawrence,* 539 U.S. at 604–06, 123 S.Ct. at 2498 (Scalia, J., dissenting) (noting that, contrary to the majority's explicit statement that the case does not address the issue of same-sex marriage, the majority opinion actually "dismantles the structure of constitutional law that has permitted a distinction to be made between heterosexual and homosexual unions" with respect to marriage), neither the majority nor concurring opinions in *Lawrence* conclude that the fundamental right to marry includes the right to marry someone of the same sex, *see Standhardt v. Superior Court of Arizona,* 206 Ariz. 276, 77 P.3d 451, 457 (2003) (holding that if the Supreme Court did not view same-gender sexual relations to be a fundamental right, the Court could not have intended to confer such status on same-gender marriage), *review denied* (2004). This Court views the Supreme Court's decision in *Lawrence* as appropriately acknowledging that all people, no matter what their sexual preferences, are entitled to respect for their private lives. The *Lawrence* holding does not require a change in the federal statutory approach to marriage.

■■■ Employing the analysis set forth by the Supreme Court for purposes of identifying fundamental liberties, there is no basis for this Court to unilaterally determine at this time that there is a fundamental right to marry someone of the same sex. The Supreme Court has cautioned courts to " 'exercise the utmost care' " in conferring fundamental-right status on a newly asserted interest. *Glucksberg,* 521 U.S. at 720, 117 S.Ct. at 2268 (quoting *Collins v. City of Harker Heights,*

503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)). Even if this Court believes there should be a fundamental right to marry someone of the same sex, it would be incorrect to suggest that the Supreme Court, in its long line of cases on the subject, conferred the fundamental right to marry on anything other than a traditional, opposite-sex relationship. *See Dean v. District of Columbia,* 653 A.2d 307, 333 (1995). It is in this respect that this Court disagrees with the contrary conclusion recently reached by the Superior Court for King County, Washington in *Andersen,* where it was determined that there is a fundamental right to marry someone of the same sex.

Furthermore, as previously stated, the Supreme Court has defined fundamental liberties as those that are *"objectively,* 'deeply rooted in this Nation's history and tradition.' " *Glucksberg,* 521 U.S. at 720–21, 117 S.Ct. at 2268 (emphasis added) (quoting *Moore,* 431 U.S. at 503, 97 S.Ct. at 1938 (plurality opinion)). "This approach tends to rein in the subjective elements that are necessarily present in due-process judicial review." *Glucksberg,* 521 U.S. at 722, 117 S.Ct. at 2268. Contrary to the *Andersen* opinion, there are no grounds to conclude *objectively* that same-sex marriages are deeply rooted in this Nation's history and tradition. *See Standhardt,* 77 P.3d at 459 (holding that because same-sex marriages are not deeply rooted in the legal and social history of our Nation, they cannot be a fundamental right).

■■■ Based on the specific directives provided by the Supreme Court for fundamental rights analysis, and in the absence of binding precedent holding same-sex marriages to be a fundamental right, this Court declines to hold that there is a fundamental right to marry someone of the same sex, as urged by the Debtor.

Accordingly, rational basis review is the appropriate review to apply in this case.[6]

A bankruptcy court is a trial court of limited jurisdiction and must be extremely cautious before creating on its own a new fundamental right based on what the Supreme Court *might* in the future decide. As the Arizona Court of Appeals stated in *Standhardt*, "[w]e are mindful of the Supreme Court's admonition to 'exercise the utmost care' in conferring fundamental-right status on a newly asserted interest lest we transform the liberty protected by due process into judicial policy preferences rather than principles born of public debate and legislative action." *Standhardt*, 77 P.3d at 459 (quoting *Glucksberg*, 521 U.S. at 720, 117 S.Ct. at 2268). *See also*, *In re Cole*, 13 F.Supp. 283, 285 (S.D.Ohio 1936) (noting that trial courts should carefully limit exercise of their power to declare acts of Congress unconstitutional).

Consequently, this Court concludes that same-sex marriage is not a fundamental right, DOMA does not directly or substantially interfere with the ability of same-sex couples to marry, and rational basis review is the appropriate level of scrutiny to apply for purposes of a due process analysis. The Court's rational basis analysis follows the discussion of equal protection provision below.

### C. Equal Protection

■ The Debtor also argues that DOMA violates the equal protection provision of the Fifth Amendment. The only equal protection clause in the Constitution

---

**6.** The UST argues that in the alternative, even if there is a fundamental right to marry someone of the same sex, DOMA does not directly or substantially interfere with the ability of anyone, including same-sex couples, to marry the individual of his or her choice. The only issue before this Court concerns joint filing status. DOMA simply addresses how couples who are married will be treated for federal purposes, calling only for rational basis review. It is not disputed that DOMA, unlike similar state statutes, does not preclude the right to marry any person, same sex or not. The Debtor, however, argues that since DOMA excludes same-sex couples from all of the rights, benefits and obligations of marriage under federal law, it thereby renders all same-sex couples "unmarried" for all purposes.

The Supreme Court has held that not every state regulation that relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. "To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed." *Zablocki*, 434 U.S. at 386, 98 S.Ct. at 681. *See, e.g., Califano v. Jobst*, 434 U.S. 47, 54, 98 S.Ct. 95, 99–100, 54 L.Ed.2d 228 (1977) (holding that loss of federal social security benefits upon marriage does not "interfere with the individual's freedom to make a decision as important as marriage"). This Court concludes that the restrictions as applied to the Debtor in the instant case are reasonable. First, the sole federal benefit at issue in this case is the ability to file a joint petition as permitted by the Bankruptcy Code in 11 U.S.C. § 302. Although DOMA has the effect of excluding same-sex couples from petitioning for joint filing status in bankruptcy, same-sex couples are nonetheless entitled to all of the protections afforded by the Bankruptcy Code. They need only seek those benefits by filing individual cases and paying separate filing fees. The Debtor does not assert that DOMA interferes with a fundamental right to bankruptcy. As the Supreme Court has made clear, there is no fundamental right, or constitutional right, to a discharge in bankruptcy. *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973); *In re Statham*, 483 F.2d 436, 437 (9th Cir.1973). Second, as discussed above, DOMA does not forbid a same-sex couple from being married under the laws of a state or a foreign jurisdiction. In consideration of DOMA, Congress explicitly pointed out that the determination of who may marry in the United States is uniquely a function of state law, and that DOMA in no way alters that situation. H.R.Rep. No. 104–664, at 3, *reprinted in* 1996 U.S.C.C.A.N. at 2907.

appears in the Fourteenth Amendment[7] and applies only to the states. 2 Ronald D. Rotunda & John E. Nowak, *Treatise On Constitutional Law–Substance & Procedure* § 14.7 (3d ed.1999). It is clear, however, "that there is an equal protection component of the Due Process Clause of the Fifth Amendment that applies to the federal government." *High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563, 570 (9th Cir.1990). The Supreme Court's approach to " 'Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment.' " *High Tech Gays,* 895 F.2d at 571 (quoting *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975)).

▮ In resolving the Debtor's equal protection challenge, the Court "must first determine what classification has been created" by DOMA. *Aleman v. Glickman,* 217 F.3d 1191, 1195 (9th Cir.2000). The Court must then ascertain the appropriate level of scrutiny to employ.

The Debtor first argues that DOMA creates a classification based on gender, and is thus entitled to heightened scrutiny. *See United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 2275, 135 L.Ed.2d 735 (1996). In so arguing, she equates DOMA's classification to the race-based classification struck down in *Loving,* 388 U.S. at 8, 87 S.Ct. at 1822 (rejecting the contention that the equal application of a statute prohibiting interracial marriages immunized the statute from strict equal protection scrutiny).

The UST counters that unlike the patent racial classification in *Loving,* DOMA does not discriminate on the basis of sex because (1) on its face, it makes no detrimental classification that disadvantages either men or women; (2) it cannot be traced to a purpose to discriminate against either men or women; and (3) it does not reflect either the baggage of sexual stereotypes or stigmatization of women. Several courts have also rejected the *Loving* analog. *See Baker v. State,* 170 Vt. 194, 744 A.2d 864, 880 n. 13 (1999) (noting that all of the seminal United States Supreme Court sex-discrimination decision have invalidated statutes that single out men or women as a discrete class for unequal treatment; under a marriage statute, there is no discrete class subject to differential treatment solely on the basis of sex); *Dean,* 653 A.2d at 362–63 & n. 2 (Steadman, J. concurring); *Singer v. Hara,* 11 Wash.App. 247, 522 P.2d 1187, 1191–92 (1974) (holding that there "is no analogous sexual classification involved in the instant case because appellants are not being denied entry into the marriage relationship because of their sex; rather, they are being denied entry into the marriage relationship because of the recognized definition of that relationship as one which may be entered into only by two persons who are members of the opposite sex."), *review denied,* 84 Wash.2d 1008 (1974); *Baker,* 191 N.W.2d at 187.

In *Loving,* the State of Virginia argued that its anti-miscegenation statutes did not violate constitutional prohibitions against racial classifications because the statutes affected both racial groups equally. *Loving,* 388 U.S. at 8, 87 S.Ct. at 1821. The Supreme Court disagreed, noting that the fact of equal application does not immunize the state from the "very heavy burden of justification" that the Equal Protection Clause "traditionally required of state stat-

---

7. The Fourteenth Amendment, Equal Protection Clause, provides, "[n]or shall any State ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

utes drawn according to race." *Loving,* 388 U.S. at 9, 87 S.Ct. at 1822. The Court held that the laws at issue were founded on an impermissible racial classification and therefore could not be used to deny interracial couples the fundamental right to marry. *Loving,* 388 U.S. at 11, 87 S.Ct. at 1823.

 DOMA defines "marriage" as "only a legal union between one man and one woman as husband and wife." 1 U.S.C. § 7. The legislative history clearly reveals that the primary purpose of DOMA is to restrict marriage to one man and one woman. The Debtor argues that because DOMA does not allow one woman to marry another woman, the legislation is a sex-based classification warranting strict scrutiny.[8] DOMA, however, does not single out men or women as a discrete class for unequal treatment. Rather, as the court in *Baker,* observed, a marriage law such as DOMA "prohibit[s] men and women equally from marrying a person of the same sex." *Baker,* 744 A.2d at 880 n. 13. Women, as members of one class, are not being treated differently from men, as members of a different class. "The test to evaluate whether a facially gender-neutral statute discriminates on the basis of sex is whether the law 'can be traced to a discriminatory purpose.'" *Baker v. Vermont,* 744 A.2d at 880 n. 13 (quoting *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979)). There is no evidence, from the voluminous legislative history or otherwise, that DOMA's purpose is to discriminate against men or women as a class. Accordingly, the marriage definition contained in DOMA does not classify according to gender, and the Debtor is not entitled to heightened scrutiny under this theory.

 The Debtor next argues that DOMA classifies based on homosexuality that also is entitled to strict scrutiny. In *High Tech Gays,* however, the Ninth Circuit held that "homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny under the equal protection component of the Due Process Clause of the Fifth Amendment." *High Tech Gays,* 895 F.2d at 574; *see Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1137 (9th Cir. 2003) (referencing *High Tech Gays* for the holding that "homosexuals are not a suspect or quasi-suspect class, but are a definable group entitled to rational basis scrutiny for equal protection purposes"). The Supreme Court's decision in *Lawrence,* does not eviscerate this holding. *See State v. Limon,* 32 Kan.App.2d 369, 83 P.3d 229, 241 (2004) (Malone, J., concurring) (noting that "*Lawrence* did not confer suspect class status on homosexuals, and in fact specifically declined to do so"). Although the majority opinion did not employ an equal protection analysis in striking down a statute criminalizing sodomy, Justice O'Connor did apply such an analysis, but determined that rational basis review was appropriate where, as in *Lawrence,* "the challenged legislation inhibits personal relationships." *Lawrence,* 539 U.S. at 579–81, 123 S.Ct. at 2485 (O'Connor, J., concur-

---

8. It is the Court's understanding, and contrary to the Debtor's assertion, that the Supreme Court has used an intermediate standard of review for gender-based classifications in equal protection analysis. *Virginia,* 518 U.S. at 533, 116 S.Ct. at 2275 (holding that the government must show "at least that the [challenged] classification serves 'important governmental objections and that the discriminatory means employed' are 'substantially related to those objectives.'") (quoting *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 150, 100 S.Ct. 1540, 1545, 64 L.Ed.2d 107 (1980)); 3 Ronald D. Rotunda & John E. Nowak, *Treatise On Constitutional Law–Substance & Procedure* § 18.20 (3d ed.1999). Thus, *Loving* is distinguishable on this basis as well.

ring). As noted in this Court's analysis of the due process guarantee, although the majority opinion in *Lawrence* may indicate a shift in the Supreme Court's treatment of same-sex couples, the Supreme Court did not hold that same-sex couples constitute a suspect or semi-suspect class under an equal protection analysis. Absent such a holding, this Court is bound by the Ninth Circuit decision in *High Tech Gays,* and must apply rational basis review, similar to that employed under the Due Process Clause.

### D. Rational Basis Review

■ If a law neither burdens a fundamental right, nor targets a suspect class, the Supreme Court "will uphold the legislative classification so long as it bears a rational relation to some legitimate" governmental end. *Romer,* 517 U.S. at 631, 116 S.Ct. at 1627. This Court has determined that DOMA does not burden a fundamental right nor target a suspect class. The Supreme Court has provided thorough guidance to the courts for purposes of applying rational basis review. *See Heller v. Doe,* 509 U.S. 312, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *Aleman,* 217 F.3d 1191.

■ "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.*" *Beach Communications,* 508 U.S. at 313, 113 S.Ct. at 2101 (emphasis added). Rational basis review is "a paradigm of judicial restraint" and "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Beach Com-*

*munications,* 508 U.S. at 313–14, 113 S.Ct. at 2101. "Nor does it authorize 'the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Heller,* 509 U.S. at 319, 113 S.Ct. at 2642 (quoting *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam)).

■ A statute is presumed constitutional. *Heller,* 509 U.S. at 320, 113 S.Ct. at 2643. " '[T]he burden of establishing the unconstitutionality of a statute rests on him who assails it.'" *Baker v. Carr,* 369 U.S. 186, 266, 82 S.Ct. 691, 737, 7 L.Ed.2d 663 (1962) (quoting *Metropolitan Cas. Ins. Co. v. Brownell,* 294 U.S. 580, 584, 55 S.Ct. 538, 540, 79 L.Ed. 1070 (1935)). The burden is to " 'negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Heller,* 509 U.S. at 320–21, 113 S.Ct. at 2643 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller,* 509 U.S. at 320, 113 S.Ct. at 2643. "[C]ourts are compelled under rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Heller,* 509 U.S. at 321, 113 S.Ct. at 2643 (quoting *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970)). "A statutory classification fails rational-basis review only when it 'rests on grounds wholly irrelevant to the achievement of the State's objective.'" *Heller,* 509 U.S. at 324, 113 S.Ct. at 2645

(quoting *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 71, 99 S.Ct. 383, 390, 58 L.Ed.2d 292 (1978)).

As previously stated, since the Debtor does not have a fundamental right to enter into a same-sex marriage and is not within a quasi-suspect or suspect class, the constitutionality of DOMA is tested under a rational basis analysis. The UST argues that DOMA meets this test primarily because it furthers the legitimate government interest in encouraging the development of relationships optimal for procreating and raising children. Additionally, the legislative history of DOMA identifies four governmental interests advanced by this legislation: "(1) defending and nurturing the institution of traditional, heterosexual marriage; (2) defending traditional notions of morality; (3) protecting state sovereignty and democratic self-governance; and (4) preserving scarce government resources." H.R.Rep. No. 104–664, at 12, *reprinted in* 1996 U.S.C.C.A.N. at 2916.

The burden of proof is on the Debtor to establish that the rational basis test is not met. The Debtor contends that the interests advanced by the UST do not provide any rational justifications for excluding same-sex married couples from the rights extended to other married couples under federal law. The Debtor argues, (1) as to procreation, federal recognition of marriage has never been limited to couples willing or able to conceive and raise children; (2) the exclusion of all same-sex married couples from federal recognition undermines the state's goal to encourage responsible procreation, because same-sex couples can reproduce with outside assistance; (3) as to the raising of children by both biological parents, the Debtor alleges that because same-sex couples can now both be biological parents of a child, DOMA in reality undermines the state's

goal; and (4) the Supreme Court has held that procreation is not a necessary or definitive aspect of marriage and has specifically rejected the notion that the purpose of marriage is to encourage the rearing of children by both of their biological parents.

To uphold the constitutionality of DOMA, the test is not whether Congress' rationale for enacting DOMA is persuasive, but whether it satisfies a minimal threshold of rationality. The review afforded under this rational basis standard is very deferential to the legislature, and does not permit this Court to interject or substitute its own personal views of DOMA or same-sex marriage. While courts have the authority to recognize rights supported by the Constitution, the creation of new and unique rights is more properly reserved for the people through the legislative process. As articulated by Justice Spina's in his dissent in *Goodridge*, 798 N.E.2d at 978, when courts extend a constitutional protection to a new right or liberty interest, they are to a great extent placing the matter outside the arena of public debate and legislative action.

The UST asserts that encouraging the development of relationships optimal for procreation is a primary government interest advanced by DOMA. Because a heterosexual union is the only one that can naturally produce a child, the UST states that government has an interest in encouraging the stability and legitimacy of this union for the benefit of the offspring. "Simply defined, marriage is a relationship within which the community socially approves and encourages sexual intercourse and the birth of children. It is society's way of signaling to would-be parents that their long-term relationship is socially important-a public concern, not simply a private affair." H.R.Rep. No. 104–664, at 14, *reprinted in* 1996 U.S.C.C.A.N. at 2918. "Marriage and procreation are fundamen-

tal to the very existence and survival of the race." *Skinner v. Oklahoma ex rel Williamson*, 316 U.S. 535, 541, 62 S.Ct. 1110, 1113, 86 L.Ed. 1655 (1942). Washington State, too, has recognized this interest: "[m]arriage exists as a protected legal institution primarily because of societal values associated with the propagation of the human race." *Singer*, 522 P.2d at 1195.

■ Authority exists that the promotion of marriage to encourage the maintenance of stable relationships that facilitate to the maximum extent possible the rearing of children by both of their biological parents is a legitimate congressional concern. *See, e.g., Bowen v. Gilliard*, 483 U.S. 587, 614, 107 S.Ct. 3008, 3024, 97 L.Ed.2d 485 (1987) (Brennan J., dissenting) (noting that " '[t]he optimal situation for the child is to have both an involved mother and an involved father' ") (quoting H. Biller, *Paternal Deprivation* 10 (1974)); *Lofton v. Secretary of the Dep't of Children and Family Servs.*, 358 F.3d 804, 819 (11th Cir.2004) (considering the state's argument that the presence of both male and female authority figures in the home is critical to optimal childhood development, the court held that "[i]t is hard to conceive an interest more legitimate and more paramount for the state than promoting an optimal social structure for educating, socializing, and preparing its future citizens to become productive participants in civil society"); *Adams*, 486 F.Supp. at 1124 (holding that it is beyond dispute that the state has a compelling interest in providing "status and stability to the environment in which children are raise"); *Standhardt*, 77 P.3d at 462–63 (holding that the state has an interest in promoting child-rearing by opposite-sex couples); *Singer*, 522 P.2d at 1197 (holding that "marriage is so clearly related to the public interest in affording a favorable environment for the growth of children that we are unable to say that there is not·a rational basis upon which the state may limit the protection of its marriage laws to the legal union of one man and one woman"). This Court's personal view that children raised by same-sex couples enjoy benefits possibly different, but equal, to those raised by opposite-sex couples, is not relevant to the Court's ultimate decision. It is within the province of Congress, not the courts, to weigh the evidence and legislate on such issues, unless it can be established that the legislation is not rationally related to a legitimate governmental end.[9] Thus, although this Court may not personally agree with the positions asserted by the UST in support of DOMA, applying the rational basis test as set forth by the Supreme Court, this Court cannot say that DOMA's limitation of marriage to one man and one woman is not wholly irrelevant to the achievement of the government's interest.

■ The Debtor and other critics however, argue that DOMA's definition of marriage permits heterosexual couples to marry regardless of whether they intend or are even able to have children. While this may be, the Supreme Court has made clear that, "[e]ven if the classification in-

---

9. Although this Court may agree with the ultimate result reached in *Andersen*, as previously stated, the UST need not produce any "evidence to sustain the rationality of a statutory classification." *Heller*, 509 U.S. at 320, 113 S.Ct. at 2643. Moreover, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."

*Beach Communications*, 508 U.S. at 315, 113 S.Ct. at 2102. Thus, the state court's reliance on the lack of "scientifically valid studies tending to establish a negative impact on the adjustment of children raised by an intact same-sex couple" is misplaced as it is not incumbent on the government to produce any evidence for the record. *Andersen*, at *21.

volved here is to some extent both under-inclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required.'" *Vance v. Bradley*, 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979) (quoting *Phillips Chem. Co. v. Dumas Indep. Sch. Dist.*, 361 U.S. 376, 385, 80 S.Ct. 474, 480, 4 L.Ed.2d 384 (1960)). Congress is not required to provide identical forms of encouragement or endorsement to same-sex couples as to those in more traditional relationships. It need only to have a rational basis for its legislation. Moreover, if the government attempted to limit marriage solely to those able or desiring to produce children, the government would be required to make such inquires of couples prior to marriage. This would implicate constitutionally-rooted privacy concerns. *See Eisenstadt v. Baird*, 405 U.S. 438, 453–54, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972); *Adams*, 486 F.Supp. at 1124–25 (recognizing government inquiry about couples' procreation plans or requiring sterility test before issuing marriage licenses would "raise serious constitutional questions."); *Standhardt*, 77 P.3d at 462 (citing *Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (1965)). Additionally, it would interfere with the fundamental right of opposite-sex couples to marry. *See Loving*, 388 U.S. at 12, 87 S.Ct. at 1824.

▮▮▮ Furthermore, that same-sex couples also raise children does not negate the reasonableness of the link between opposite-sex marriage and child-rearing. That children in same-sex families could also benefit from the stability offered by marriage, as previously stated, rational classifications cannot be struck down merely because they are to some degree over- or underinclusive. *See Vance*, 440 U.S. at 108, 99 S.Ct. at 948. Moreover, classifying governmental beneficiaries "in-evitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *Beach Communications*, 508 U.S. at 315–16, 113 S.Ct. at 2102 (quoting *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980)). "[A]s long as plausible reasons exist for placement of the current line," the reasonableness of a classification cannot be set aside. *Standhardt*, 77 P.3d at 463.

The Debtor also argues that DOMA is like Colorado's Amendment 2 that was struck down in *Romer v. Evans* for failure to meet the rational basis test. *Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). In *Romer*, the Supreme Court considered an equal protection challenge to Amendment 2 to Colorado's constitution that "prohibited all legislative, executive, or judicial action at any level of state or local government designed to protect homosexual persons from discrimination." *Romer*, 517 U.S. at 624, 116 S.Ct. at 1623. Applying rational basis review, the Supreme Court held that Amendment 2 did not bear a rational relationship to a legitimate government purpose. The primary rationale offered by the State for Amendment 2 was "respect for other citizens' freedom of association, and in particular the liberties of landlords or employers who have personal or religious objections to homosexuality." *Romer*, 517 U.S. at 635, 116 S.Ct. at 1629. The Supreme Court held that the amendment had the "peculiar property of imposing a broad and undifferentiated disability on a single named group," and "its shear breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S. at 632, 116 S.Ct. at 1627.

In contrast, DOMA is not so exceptional and unduly broad as to render the UST's reasons for its enactment "inexplicable by anything but animus" towards same-sex couples. *See Standhardt,* 77 P.3d at 465 (rejecting *Romer* analogy on grounds that statute limiting marriage to opposite-sex couples furthers a proper legislative end and was not enacted simply to make same-sex couples unequal). Rather, DOMA simply codified that definition of marriage historically understood by society. *See Adams,* 486 F.Supp. at 1123 (observing that marriage historically has been defined as the union between persons of different sex).

The House Report indicates that Congress considered as interests in enacting DOMA, protecting state sovereignty and democratic self-governance, morality, and preserving scarce government resources. The UST, however, neither raises nor relies on these asserted interests as grounds to uphold the constitutionality of DOMA. Basing legislation on moral disapproval of same-sex couples may be questionable in light of *Lawrence.* The Debtor makes no mention or attack of these interests, but as the Court concludes that the government has a "conceivable" legitimate interest in enacting DOMA that is rationally related to promote an optimal social structure, the Court need not consider these additional interests advanced by Congress in its legislative history.

This Court concludes that DOMA does not violate either the Due Process or Equal Protection Clause of the Fifth Amendment.

Finally, the Debtor argues that the joint petition should be allowed because Ann C. Kandu, one of the Debtors, died since the initial filing of their joint bankruptcy petition. Accordingly, the joint petition would not offend the purpose of DOMA. The Debtor asserts she is not seeking recognition of an ongoing relationship with a same-sex spouse. She is simply seeking to resolve the disposition of assets and property.

The Court recognizes that the Debtors' situation has changed since the filing of the joint petition; however, this Court must ascertain the Debtors' status at the time the bankruptcy petition was filed. Although one of the Debtors is now deceased, the posture of this legal proceeding is unchanged. Further, despite the Debtor's assertion to the contrary, the Debtor is in fact seeking recognition of her same-sex marriage as of the petition date that would necessarily require this Court to recognize the relationship as a "marriage" under the Bankruptcy Code.

## CONCLUSION

The Court concludes that DOMA does not violate the principles of comity, or the Fourth, Fifth, or Tenth Amendments to the U.S. Constitution. The Debtors' petition in bankruptcy shall be dismissed on September 3, 2004, unless the Debtors have filed a motion to bifurcate prior to said date.